## PLINY A. JEWETT vs. CITY OF NEW HAVEN.*

A municipal corporation was empowered by its charter to provide for the preservation of the city from damage and exposure to danger from fire, and to establish and regulate a fire department.

Held, that the charter must be regarded as imposing a public duty for the public welfare, and that the fire department established and organized under the provisions of the charter, when engaged in extinguishing fires were performing a public, governmental act, for the general good, and that the members of the fire department were not such servants of the city that an action would lie against the city for their negligence or misconduct while acting in the discharge of their official duty.

TRESPASS ON THE CASE, for injuries to the plaintiff by the negligence of a fireman of the defendant while employed in extinguishing a fire; brought to the Superior Court in New Haven county, and reserved on facts found for advice. The facts found by the court were substantially as follows:

About noon on the 14th of April, 1865, the plaintiff was driving with his horses and carriage in a public highway in the city of New Haven, at a moderate and proper rate of speed;

---

* This case was argued at the September term, 1870, but was not decided in season to be inserted in its place.

when the carriage of the plaintiff, without negligence or fault on his part, was run into and struck with great force and violence by another horse attached to and drawing a hose-cart, both of which belonged to the city as part of its fire extinguishing apparatus, and which were then under the charge and control of a member of the fire department of the city of New Haven, as a hose-cart driver, and who was at the time acting in that capacity. At the time of the collision fires had broken out in different sections of the city, threatening serious destruction to property. The driver of the hose-cart was proceeding toward the engine house, whither he had been sent by his superior officer, one of the engineers of the fire department, with instructions to move with all possible speed, to procure additional hose, which it was necessary to use in the extinguishment of one of the fires. The fire for which the additional hose was required was on the corner of State and George streets, where the hose-cart then was. The hose-cart was driven up State street toward the engine house in Artisan street. The collision occurred at the junction of State and Chapel streets, the plaintiff's carriage being struck just as it had passed the center of State street. At the same time the streets at and in the vicinity of the place where the collision occurred were free from carriages, passengers and other obstacles in the way of travel. The driver of the hose-cart was going at a very rapid and dangerous rate of speed, and by his negligence and failure to exercise reasonable and proper care, drove into and against the plaintiff's carriage, damaging it and doing injury to the person of the plaintiff.

At the time in question there was a fire department in New Haven, organized under the charter and by-laws of the city, for the purpose of extinguishing fires; which fire department included engineers, engine companies, hose companies, and drivers of engines and hose-carts; all of whom were appointed by the Board of Fire Commissioners, pursuant to said charter and by-laws, and were paid regular salaries or wages for their services by the city. The city then owned sundry engines, hose-carts and horses, which had been purchased by the Board of Fire Commissioners, not for their own

ownership, but to be owned by the city, and which had been paid for by the city, and were intended to be used, and were in fact used, by the members of the fire department in the extinguishment of fires.

*H. B. Harrison,* for the plaintiff.

It is expressly found that the plaintiff was not guilty of any negligence or fault, and that the injury was caused solely by the negligence of the hose-cart driver, and his failure to exercise reasonable and proper care. The city then is liable if the hose-cart driver was at that time the servant of the city, engaged in the course of his employ.

The defence really rests upon a false theory concerning the organization of the city, and its mode of action as a municipal corporation. "All the inhabitants being electors of this state," within certain limits, constitute the corporation. All these "inhabitants," as thus incorporated, are vested with numerous powers over certain subjects in which they have a special interest, and in which the public at large, outside of the city, have no such special interest. *Jones* v. *City of New Haven,* 34 Conn., 1. These powers cannot be exercised directly by all of these "inhabitants" *en masse.* Consequently the charter provides a system of agencies through which the powers may be exercised by the corporation. Some of these powers are exercised through the common council, (who wield the legislative powers and some of the ministerial powers,) wielding them however not for themselves, but as agents through whom the corporation acts. Some of these powers are exercised by subordinate agents appointed by the common council. Those agents, however, are not agents of the common council, but of the corporation, a part of whose powers it is their subordinate function, as such agents, to exercise. Among the powers so vested in the corporation is that of providing for the preservation of the city from damage by fire, and from exposure to danger from fire, and of creating and regulating a fire department in said city. Accordingly the common council, on the 19th of May, 1862, enacted a by-law, reorganizing the fire department, and providing for the ap-

pointment of Fire Commissioners, charged with the general management of the department. On the 13th of June, 1862, the General Assembly passed an act making the system of the by-law permanent as part of the charter of the city. The result is that the functions assigned by said by-law and said act to the Fire Commissioners cannot be exercised by the corporation except through the Fire Commissioners. But this fact does not make the Fire Commissioners agents of the state. The state does not appoint them. The corporation appoints them, through its primary agents, the common council. The business of the Fire Commissioners is not the business of the state, but of the corporation. The fact that the Fire Commissioners hold office for a fixed term, during which the corporation cannot remove them, does not make them any the less agents of the corporation while their term lasts. The Fire Commissioners appoint the members of the fire department. But in so doing they act not for the state, or for themselves, but for the corporation. The Fire Commissioners, thus acting as agents of the corporation, appointed the hose-cart driver, and gave into his custody and control the horse and cart with which he ran the plaintiff down. The by-laws of the city at that time provided that any man so appointed should be paid forty dollars a year for his services by the city. The appointment of the driver, under these circumstances, and his acceptance of the appointment, instantly established the relation of employer and servant between the corporation and him. And that relation, when established, existed between the corporation and him directly and immediately. In the business for which he was so employed he was the servant of the corporation, and was not the servant of anybody else. Charter of New Haven, secs. 1, 24; Charter and By-Laws, 80, 44, 83. The city therefore is liable. *City of Chicago* v. *Powers*, 42 Ill., 169; *Lacour* v. *Mayor &c. of New York*, 3 Duer, 406; *Delmonico* v. *Mayor &c. of New York*, 1 Sandf., 222; *Conrad* v. *Trustees of Ithaca*, 16 N. Y., 158, and note; *Weet* v. *Trustees of Village of Rockport*, id., 161; *Cotes* v. *City of Davenport*, 9 Iowa, 227; *Jones* v. *City of New Haven*, 34 Conn., 1; *Rochester White Lead Co.* v. *City of Rochester*,

3 Comst., 464; *City of Dayton* v. *Pease,* 4 Ohio, S. R., 80; *Loyd* v. *Mayor &c. of New York,* 1 Seld., 369; *Ross* v. *City of Madison,* 1 Carter, 281; 1 Amer. Lead. Cas., 469; Abbott Dig. Law of Corp., 524–533 and cases cited.

*C. R. Ingersoll* and *Watrous,* for the defendant, cited *Barney* v. *City of Lowell,* 98 Mass., 570; *Morrison* v. *City of Lawrence,* id., 219, 221; *Walcott* v. *Inhabitants of Swampscott,* 1 Allen, 101; *Buttrick* v. *City of Lowell,* id., 172; *Kimball* v. *City of Boston,* id., 417; *Russell* v. *Mayor &c. of New York,* 2 Denio, 461; *Terry* v. *Mayor &c. of New York,* 8 Bosw., 504; *Treadwell* v. *Mayor &c. of New York,* 1 Daly, 123; *O'Meara* v. *Mayor &c. of New York,* id, 425; *The People* v. *Morris,* 13 Wend., 325, 337; *Town of Marietta* v. *Fearing,* 4 Hammond, 427, 432; *Burke* v. *Norwich and Worcester R. R. Co.,* 34 Conn., 474; Shearman & Redfield on Negligence, § 139.

PARK, J. The plaintiff was injured through the carelessness of one of the members of the fire department of the city of New Haven, called a hose-cart driver, who was engaged with the department at the time in efforts to extinguish a fire that was raging in one of the wards of the city. At this time fires had broken out in different sections of the city threatening serious destruction to property. At one of the fires the department was in need of additional hose, and the driver was told by his superior officer to proceed with all possible dispatch to the engine house, and procure the necessary hose. While the driver was obeying the order the injury to the plaintiff occurred.

It is not pretended that the driver was an improper person to be appointed to the position which he held, or that the Board of Fire Commissioners was any way in fault respecting his appointment or continuance in office, but the case presents the naked question whether the driver was the servant of the city while engaged in driving the hose-cart that injured the plaintiff, so that the principle of *respondeat superior* applies to the city. This question suggests the consideration of another question, and that is were the fire department acting for

the public in the extinguishment of these fires, or were they simply transacting the private business of the city?·

We will first consider this question. The property being destroyed by the fire which the department were endeavoring to extinguish did not belong to the city. It was the private property of individuals. The city had no interest in it, farther than that general, public interest which all persons, natural and artificial, have in the property of others. The body politic is so constituted, and the relations of its individual members are so interwoven, that the prosperity of one depends in a measure upon the prosperity of all. If one suffers in consequence of the destruction of his property, that one may feel the loss more keenly than others, but all feel it to a greater or less extent, depending upon the amount of the loss. The ruin occasioned by the recent terrible conflagration in a western city was not confined to the territorial limits of that city, but was a wide spread calamity. Every department of business suffered to some extent throughout the country. Stocks fell in the market; grain and all kinds of produce rose in value; the money market became stringent; and there were fears for a time of a general panic involving the country in financial disaster. A city in this state, although far distant from the scene of ruin, suffered directly to the extent of many millions of dollars. It was a national calamity; yea more, it was a calamity to the commercial world—so felt, so regarded. Had it been known that so terrible an event was impending over that city and could not be averted without assistance from abroad, thousands would have volunteered their services with as much alacrity as to repel an invading foe. As it was, cities hundreds of miles distant proffered all the aid in their power, and while the fire was raging hastened off their fire departments. They were doubtless actuated to a great extent by feelings of humanity, but this was not all. The great public loss that would be occasioned by the ruin of a great city, full of merchandise, full of supplies of which hundreds of thousands were in need, and upon which they depended for food and clothing, likewise impelled them. Who can realize the effect that a few such calamities would at any time pro-

duce on the country and the commercial world, should they occur in quick succession ? The value of property that would be destroyed, although enormous, would be small in comparison with the aggregate of loss and suffering that would be produced. Such being the consequences of fires, how can it be said that the persons engaged in extinguishing them are engaged merely in the performance of a private duty ? What is true of a great fire is true of a small one. They differ only in degree. Every fire occurring in certain localities in every city, when the wind is blowing a tempest, threatens the destruction of that city, with all its consequences to individuals and to the public at large. Every fireman therefore who is engaged in extinguishing such fires is laboring for every man who owns property within the city ; for every insurance company that has a policy on any of the property ; for every creditor who looks to the property of his debtor doing business within the city for the payment of his debt ; for every laborer who is employed in the thousand different kinds of business transacted therein, in workshops and factories, in the streets and highways, in constructing buildings and drains, and indeed in every employment that can be named ; for every farmer who depends upon the city for a market for the sale of his productions, and for the supplies which he needs in exchange ; for all the poor, to the extent that the destruction of so much merchandise would enhance the value of the necessaries of life ; for the prevention of untold misery and suffering that the destruction of a great city would inevitably produce ; for the state and country at large that are directly interested in the prosperity of all their citizens. It is difficult to conceive how the labors of any man can affect a larger number of the public than those of a fireman.

A burglar enters a dwelling and steals sixpence worth of property and escapes. The officer who goes in pursuit is acting for the public—is in public employment. This is universally conceded. How much more is the fireman in fact acting for the public when engaged in the performance of his duties ? A building within a city is being destroyed by rioters. A corps of police officers interferes to protect the build-

ing, and is successful. Later in the day the building is on fire. A corps of firemen interferes to protect the building, and the fire is extinguished. Where lies the difference in principle in the character of the interference ? Each corps is under the direction of the city. Each corps is selected and paid by the city. Each corps saves the building from destruction—one from fire, the other from rioters. Where lies the difference ? The interest of the city is the same in the two cases. The property is the same. The object of the interference is the same. If unsuccessful, the injury to the owner would be the same. Where lies the difference ? There is no difference except in the mode that threatens the building with destruction, which certainly constitutes no difference in principle. And furthermore, a house on fire within a city is a public nuisance. The city comes with its fire department and abates it. The act of abatement takes its character from the thing abated. The abatement of a private nuisance is a private act. The abatement of a public nuisance must be a public act. How can it be otherwise ?

But it is said that although the labors of firemen are public in their character, still government has never taken upon itself the duty of protecting its citizens from the ravages of fire, as it has done to protect their persons and property from the effects of crime. Therefore firemen cannot be regarded as performing a governmental duty in the extinguishment of fires. It is true there is no public statute establishing a fire department in all the towns, as well as cities, of the state ; and the reason is obvious. A law of this character would be useless everywhere except in cities and boroughs. Fire in the country would accomplish its work long before the members of a fire department could have warning, and time to assemble and transport their fire apparatus to the scene of danger. The nature of the case renders the adoption of such protective measures as these of no avail in such localities. And furthermore, fires in the country seldom occur, and when they occur the damages resulting from them must necessarily be small, so that, if such measures were practicable, the expense of maintaining an efficient fire department in a sparsely inhab-

ited region would greatly exceed the damages resulting from fires. The reasons are cogent why a law of this character is not found on the statute book. But in cities, where the danger is great and such measures feasible, statutes are found on the subject. And in this very city of New Haven we find an act passed by the General Assembly in the year 1862 establishing a Board of Fire Commissioners for the city, and giving to the board the control of all the fire department of the city, together with all the property used in such department, and investing the board with the exclusive power of appointing and discharging all members of the department. This statute speaks with all the authority of any statute passed by the legislature. It prescribes the mode for the appointment of the board; the duration of office of its members; the power vested in them; the duties they are to perform, and all the requisites of an efficient fire department for the protection of property within the city. If it be said that this law does not embrace the other cities of the state, and is therefore local in its character, the answer is it is as general as the legislature in its wisdom saw fit to make it. The different cities of the state differ to some extent in their needs upon this subject; and different opinions prevail in regard to the best mode that should be adopted. The legislature has seen fit to conform its action to some extent to these opinions in different cities. It is believed that all cities and boroughs have authority vested in them by their charters to protect themselves from the ravages of fire, and whether such provisions are like the one in question or not is a matter of little importance.

But it is said that the city of New Haven solicited the passage of this act, and it was granted as a privilege; that previous to the passage of the law the city enacted· a by-law, similar in all essential particulars to the law in question, and subsequently requested the legislature to give it the sanction of a public act, which was done in the sense of conferring a favor. There is nothing in the case tending to show that such a request was ever made; but if it was, it is difficult to see what effect it would have upon the subject in controversy. Many acts in relation to public matters are passed at the re-

quest and solicitation of large numbers of the people of the state. But such laws when enacted carry with them all the force of any enactment. It is true it is said in the case of *Jones* v. *City of New Haven*, 34 Conn., 1, that the provision in the charter of the city in relation to the protection and preservation of the shade trees that line the public streets, and are found upon the public squares of the city, was solicited and granted as a privilege to the city. But that was said in relation to what was conceded to be a private matter of the city, and was in no sense public in its character. The law in question is directly the opposite. It is in no sense private, but is altogether public in its character, as we have seen.

If then the law in question is in the nature of a public law, in relation to a public matter which concerns the state and a large portion of the public, as well as the city in its corporate capacity, what matters it whether the people whose property was intended to be preserved from destruction by it solicited its enactment or not? One would suppose there was cause enough to move the law making power to action on the subject without any solicitation whatsoever; for it can hardly be supposed that it was a matter of no concern with the legislature whether the city of New Haven should at any time be laid in ashes or not.

When was it known or claimed until now that a law which confers nothing whatsoever of a positive character, that has no tendency to increase the possessions, comfort, convenience, luxuries or prosperity of any person, that makes no addition of anything desirable by way of ornamentation or otherwise to any of its subjects, but the sole object of which is the preservation of property and almost life itself, is to be regarded as a boon to the people when enacted? Government should rather be regarded as remiss in its duty if it neglected to furnish such protection to its citizens. The most that can be said is that the people of New Haven were willing to bear the burden imposed by the law, rather than lose their possessions by the ravages of fire. They were in the condition where they were compelled to choose one or the other of two evils, and they chose the less; but this makes the less none the less

an evil—none the less a burden.  Should the legislature the coming spring propose to repeal the laws regarding burglary and theft, no doubt the people of New Haven, in common with the remaining inhabitants of the state, would remonstrate against the proposed repeal upon the same principle. They would be willing to continue to bear the burden of maintaining criminal courts, police officers and sheriffs, rather than their property should be left to burglars and thieves. Does any one suppose that the legislature which first passed these laws was regarded in the light of a benefactor—as doing anything more than its duty ?  And is there any difference in principle in the cases ?  Fire destroys more property in a single year than all the property that burglars and thieves have run away with since the foundation of the government. In view of these considerations, we think this law must be regarded as imposing a public duty for the public welfare, and that the fire department of the city when engaged in extinguishing fires are exercising one of the functions of government for the general good.  This view of the law is further supported by the following considerations.  In the year 1861 a law was passed creating a Board of Police Commissioners for the city of New Haven, and upon the board were conferred all the powers, and through them the performance of all the duties, in that department of the public service of the city.  In the year 1864 an act was passed creating a Board of Road Commissioners for the city of New Haven, and upon the board were likewise conferred all the powers, and through them the performance of all the duties, in that department of the public service of the city.  In the year 1862 the law in question was passed, creating a Board of Fire Commissioners, and conferring upon the board all the powers, and through them the performance of all the duties, of that department.  These acts were passed expressly for the city. One of them is no more local than another—has no more jurisdiction than another—seemingly, is no more private than another—for aught we know its enactment was no more solicited than another.  The boards are created in similar language ; the members elected in a similar manner ; the powers

conferred, duties imposed, the general management and machinery for transacting the business of the several departments, are strikingly similar, *mutatis mutandis*.   Now it is conceded that the boards of police and road commissioners have governmental duties imposed upon them by two of these enactments. What reason is there for saying that the board of fire commissioners have nothing more imposed upon them by the third enactment than to perform the private duties of the city ?

This view of the law is further supported by the fact, that the public statutes of the state seem to recognize the members of all fire departments as engaged in public employment. They are exempt from service as jurors.   Gen. Stat., 29. They are exempt in certain cases from military duty.   Id., 576. They are exempt from the payment of poll tax.    Id., 707. Fire Marshal courts are established in all the cities and boroughs of the state ; and similar authority is given to all the justices of the peace in all the country towns of the state to inquire into the origin of fires, and make report concerning the same.   Gen. Stat., 296.   There are also several decided cases bearing upon this question.   In the case of *O'Meara* v. *Mayor &c. of New York*, 1 Daly, 425, BRADY, J., in speaking of the fire department says, " Its members owe their allegiance to the city, not as members of the corporation, but as members of an organization identified with the administration of the city government, and forming a part of its protective police."    Shearman and Redfield on Negligence, sec. 139, cites this case with approbation.

It is said that the firemen in this case were volunteers, and therefore the relation of master and servant did not exist between them and the city ; although they were under the control of engineers appointed by the city, and were subject to the city by-laws ; and although the city furnished them with engines and engine buildings, and all the necessary apparatus for the extinguishment of fires ; and although they volunteered their services to the city to perform for them the very duty that is performed by enlisted and paid fire departments of other cities, and were accepted by the city for the sole purpose of having that duty performed.   It would seem that if

any element exists in the case inconsistent with the relation of master and servant, it does not consist in the fact that the firemen volunteered their services to the city, and were free to abandon the same at any time. The relation of master and servant does not depend upon the fact whether service is volunteered or not, or has been tendered free from compensation or not, but on the fact whether the party doing the service is under the control and direction of another, doing for him whatever he requires to be done in some particular line of service; no matter whether the performance of the service is prompted by feelings of generosity, or the desire of popularity, or enjoyment in doing the service, or by motives of pecuniary gain. Compensation for the labor is not a necessary element in the principle *qui facit per alium facit per se.*

The Supreme Court of Ohio, in the case of *Wheeler* v. *City of Cincinnati,* 19 Ohio S. R., 19, where the plaintiff sought to recover damages of the city arising from the casual destruction of his house by fire, on the ground that the city had neglected to provide necessary cisterns and suitable engines for the extinguishment of fires, and on the further ground that certain officers of the fire department of the city had neglected to perform their duty in the extinguishment of the plaintiff's fire, whereby the plaintiff's house was destroyed, use this language in giving the opinion of the court whether the action could be sustained or not : " The laws of this state have conferred upon its municipal corporations powers to establish and organize fire companies, procure engines and other instruments necessary to extinguish fires, and preserve the buildings and property within their limits from conflagration ; and to prescribe such by-laws and regulations for the government of such companies as may be deemed expedient. But the powers thus conferred are in their nature legislative and governmental." * * * " The power of the city over the subject is that of a delegated quasi sovereignty, which excludes responsibility to individuals for the neglect or the nonfeasance of an officer or agent charged with the performance of duties."

The Supreme Court of Massachusetts, in the case of *Hafford* v. *City of New Bedford,* 16 Gray, 297, took the same

view of the duties of firemen that we have taken. The court say, " The members of the fire department of New Bedford, when acting in the discharge of their duties, are not servants or agents in the employment of the city for whose conduct the city can be held liable ; but they act rather as officers of the city, charged with the performance of a certain public duty or service ; and no action will lie against the city for their negligence or improper conduct while acting in the discharge of their official duty." The facts of that case are similar to the one we have in controversy. The plaintiff was injured while traveling upon the sidewalk of that city, through the carelessness of a company of firemen, who were running upon the sidewalk to a fire with a machine with great speed. The plaintiff was struck by the machine, knocked down, run over and greatly injured.

This case has been recognized as law and the principle applied to other cases in several subsequent decisions in that state. It was applied in *Wolcott* v. *Inhabitants of Swampscott*, 1 Allen, 101 ; where it was held that the town was not liable for an injury sustained by reason of the negligence of a laborer employed by the highway surveyor of the town to aid him in performing the duties of his office. The court say, " We cannot distinguish this case from *Hafford* v. *City of New Bedford.*" It was applied in *Buttrick* v. *City of Lowell*, 1 Allen, 172 ; where it was held that the city was not liable for an assault and battery committed by its public officers, even though it was done in an attempt to enforce an ordinance of the city. The court say, " This case must be governed by the decisions in *Hafford* v. *City of New Bedford*, and *Wolcott* v. *Inhabitants of Swampscott.*" It was again applied in *Barney* v. *City of Lowell*, 98 Mass., 570 ; where it was held that the city was not liable for an injury caused by the negligence of a teamster employed in transporting stone to repair a highway by the superintendent of streets, who was charged by a by-law of the city, passed under authority of the city charter, with the duty of keeping the streets in proper repair, and making contracts for the supply of ordinary labor and materials therefor. The principle

of *Hafford* v. *City of New Bedford* was relied upon by the court as one among other cases that governed the decision.

In the case of *Fisher* v. *City of Boston*, 104 Mass., 87, the court again decided that a city is not liable for a personal injury resulting from the negligence of the officers and members of its fire department in the performance of their duties, although the department was established and regulated under a special statute which applied to the city alone, and by its terms required that it should be accepted by the city council before it should become a law. The same considerations were urged in that case in favor of the plaintiff that are presented in the case at bar. It was said that the statute under which the fire department was organized was a special act, and conferred upon the city powers and privileges that did not belong to it under the general laws; that it applied to Boston alone, and no other town or city could avail itself of the provisions of the statute; that the act did not impose any public duty to establish a fire department, but gave this privilege to the city for its own private benefit and local advantage; that the city incurred no obligation under the act until it accepted the grant, and it did so because the grant was directly beneficial to the city, &c. The case was decided in favor of the city, on the ground that firemen act for the public in the extinguishment of fires.

The fire department in each of these cities, New Bedford, Boston, and Cincinnati, was organized under a special act of the legislature, which applied in each case to the city alone. In each case the act merely authorized the establishment of a fire department, leaving the question to the city to determine whether it should be done or not. It is difficult to distinguish the principle of these cases from the one we have in hand. It may be said that in the case last cited the action was based upon nonfeasance of duty; but if it be true that the act of extinguishing fires is a private act, it would seem to follow, according to the principle of the case of *Jones* v. *New Haven*, 34 Conn., 1, that the city having taken upon itself the performance of the duty of extinguishing fires, and having taxed its citizens to pay the expenses necessarily attending such

performance, thereby agreed to attend to the duty faithfully, and is as much liable to a party injured in consequence of nonfeasance of duty in this respect, as it would be for misfeasance.

A majority of the court therefore think, on reason and authority, that the defendants are not liable.

There is another view that may be taken of this case. Fire departments, having fire companies officered and drilled into military discipline for the extinguishment of fires, and having powerful machines for the purpose propelled by steam and by the united strength of large bodies of men, are institutions of comparatively modern invention. Not long ago men hastened individually to fires, with buckets and other simple manual instruments, and without organization or much concert of action endeavored to stay the destruction of fire. At that time when the alarm bell sounded the population of cities rushed forth *en masse*, all anxious and eager to do what was best to be done; but there was no controlling power to direct the forces to favorable points; no men skilled in the extinguishment of fires to take the lead; no general plan for concert of action; no instruments that could be used with efficiency after the flames had burst through windows and doors; but amid the greatest confusion and alarm the fire in most cases accomplished its work. Such scenes were common within the memory of men now living. The inhabitants of cities were as anxious then to extinguish fires as they are now. They labored themselves to accomplish the object, and labored as hard as they do now, although their labors were to a great extent in vain. Now suppose at one of these fires some person had induced the crowd to believe that he possessed superior knowledge in the extinguishment of fires, and in consequence they had appointed him their engineer for the time being. Suppose more buckets were needed, and the engineer had given an order to some one to proceed for them with all possible dispatch, and while the order was being obeyed an injury had occurred to the person of another, through the carelessness of the party directed. Would the party giving the order be responsible for the injury? Would

the relation of master and servant exist in that case ? This will hardly be claimed. Where lies the difference in principle between that case and the present one ? If it be said that the engineer was a volunteer in the business he was transacting, that he performed it through feelings of philanthropy, in the same sense it may be said that the city was acting at the time in question, if we lay out of view all the statutes on the subject, and the general interest of the city in the prosperity of all its citizens, which is nothing more than the interest of the state itself. Aside from such considerations, the action of the city cannot be regarded in any other light than of the strictest philanthropy, if that term can properly be applied to a municipal corporation. They had no other interest in the property exposed to ruin than the engineer had in the case supposed. The object of both was the salvation of property belonging to others. Fire companies, officered and drilled and furnished with powerful machines, merely take the place of the unorganized mass of individuals who assembled at fires a few years ago with buckets and pails. The ravages of fire cannot be resisted successfully except by the organization of large bodies of men. Fire is like a foreign foe in this particular, and must be resisted in a similar manner. As well might men go out single handed to meet an enemy organized and accoutred with all the modern implements of war, as meet a conflagration in a similar manner. Out of the nature of the case arises the necessity of organized bands of firemen to cope with fire. If they are to be organized, then they must be officered and drilled. They must be subject to some power which has the control of them, and to which they must be held accountable. In this way only can efficient firemen be made. Now there are no local powers that can have the control of such bands of men, except the local government of cities. The case therefore is reduced to this necessity ; either fires must be left to take care of themselves, and burn themselves out for the want of fuel in the nature of property to consume, or there must be organized bands of firemen to extinguish them, under the control of city governments. There is no other feasible alternative. The utter insufficiency of the old mode

of extinguishing fires led the ingenuity of man to devise a better one, and his wisdom brought forth the present system as a substitute ; so that when an alarm of fire is now made, instead of a promiscuous body of men with buckets and pails, comes the city itself, with its fire department and powerful engines, to stay the conflagration.  Although the two systems differ widely in the degree of their efficiency, still in principle they are the same.  If I assist my neighbor in the extinguishment of his fire, I am laboring for him—for his benefit.  Can it make any difference whether I am alone or with others ; and if with others, whether we act together or separately ; whether we are organized or unorganized ; whether we have improvements adapted to the purpose of extinguishing fires, or have none that we can use to advantage ?  In either case I am still laboring for my neighbor whose building is on fire. Hence, if we strip this case of all statutes on the subject, and make the act of the city in organizing its fire department purely a voluntary act, then the act of the city in aiding its citizens in the extinguishment of their fires cannot be distinguished in principle from the act of the engineer in the case supposed.  The most that can be said, in this view of the case, is that the city keeps at the will of its citizens, for them and in their stead, an organized body of men ready at all times to be called upon by them as occasion may require.  Hence the fire department is more the servant of the citizens than it is of the city.  The city is constituted merely the governing power to give it efficiency.  But it is said the fire department of New Haven are paid for their services, and that this is an important consideration in determining whether the relation of master and servant exists in a given case.  It may be important as evidence, but it is no criterion to determine the fact.  One man may be the servant of another, and a third party may pay his wages on a contract between him and the third party.  One man may give his services to another, and still the relation of master and servant may exist between them.  Wages may be paid, and still the relation of master and servant may not exist ; which is the case in question.  And furthermore, public servants are paid for their services as well

as private ones.  The departments of police and road commissioners in this very city are paid for their services, and these departments are confessedly public in character.  A body of efficient men cannot be obtained in any other way. The same necessity exists in the fire department, and for the same reason.  They must be paid, or they cannot be had. The city pays them, and the state pays them in exempting them from the payment of poll tax, and from service as jurors, and from military duty in certain cases; all which are burdens to be borne by others.

A majority of the court are satisfied that the relation of master and servant does not exist between the city and its fire department.  We think, in a case like the present one, where the question is whether the principle of *respondeat superior* applies to a municipal corporation, it should distinctly appear, in order to hold them liable, that the service in which the party doing the mischief was engaged at the time was private and not public ; that it was not rendered for others as acts of benevolence, while the party was laboring for their benefit, in their employment.  Municipal corporations are different from those of a monied character.  A stranger coming to reside within the territorial limits of a city becomes *instanter* a member of the corporation by force of law.  He has no will of his own to exercise in the matter.  Surely the principles of law should not be strained in order to hold such a party bound for the acts of those he had no voice in appointing.

A majority of the court are therefore of the opinion that judgment should be rendered for the defendants ; and so we advise.

In this opinion FOSTER and SEYMOUR, Js., concurred.

BUTLER, C. J.  The increase of special municipal corporations in this country, and the great extension of their powers within a period not remote, have occasioned much litigation respecting the extent of their right to immunity in the exercise of the powers conferred by their charters.  There have been

frequent struggles in this and other courts, by injured litigants on the one hand to make them liable at common law for negligence in the performance of governmental duties, irrespective of statutory liability, on the ground that their special charters are contracts which bind them, in consideration of the privileges granted, to the faithful performance of *all* duties; and like struggles on the other hand by such corporations to extend their immunity to other than governmental powers and duties. The decisions in different states are conflicting; but elementary impressions, the discussions listened to in this court, and an examination of the cases decided elsewhere, have satisfied me that the following principles, as applicable to this class of cases, are correct and should control in their determination.

1. Officers and agents of the government partake of its immunity, and are not liable for negligence in the performance of functions or duties which are strictly governmental, whether such agents act in a corporate or individual capacity. But such immunity does not reach to or protect a contractor or his servants who contracts with the government or its officers and agents to perform a governmental work.

2. Municipal corporations, to the extent that they are authorized or directed to exercise public governmental powers, and perform public governmental duties, solely for the general good, are governmental agencies, and entitled to immunity in respect to the acts of their subordinate officers or agents. But when the power and duty are not governmental, and in special cases where they are, but where the corporations derive some special pecuniary benefit or advantage from the exercise of the power, or have specially undertaken to perform the duty in consideration of some special advantage, the rule is otherwise, and they are liable like other corporations for actual misfeasance.

3. The original and ordinary municipal agencies for this state are counties, towns and school districts. Special city and borough charters have also been granted to the inhabitants of densely populated portions of towns, at their request, in part to enable them to exercise the ordinary governmental

powers, which the town before exercised over the same territory more efficiently, but mainly to enable them to enjoy a variety of other special powers and privileges not governmental, for the special benefit of the local community.

Looking at this case carefully and in the light of those principles, I think it involves an *actual misfeasance*, in the exercise of a power *not governmental*.

In 1862 the city of New Haven adopted by ordinance a paid fire department system. Subsequently, and presumptively at the request of the city, the legislature sanctioned it by an amendment of their charter. I say presumptively at the request of the city; for we all know, as a matter of fact and judicially, that the legislature in its " usual course of proceeding" does not impose these special charters upon the local communities, nor change them, of its own motion, without being requested to do so. The department then was a part of the city organization, and the person who committed the injury complained of was an hired and paid employé of that department, and therefore a paid servant of the city. The relation of master and servant existed between them, and he was in the performance of a duty which he was employed and directed to perform, and the city, as his superior, is liable to respond for the injury occasioned by his negligence, unless protected by governmental immunity. Although a majority of the court seem to doubt or deny the existence of the relation, I think it incontrovertible, and that the only disputable question in the case is, whether or no that servant was engaged in the performance of a governmental duty. To determine that question, we must look at the charter of the defendants and the character of the duty.

There are certain powers granted by the charter of the defendants, which are confessedly in their nature and from immemorial exercise and recognition, governmental; such as the construction and repairs of highways and streets; the preservation of the public health by a board constituted for that purpose; the prevention and punishment of crime by a police department and court; and the prevention and abatement of public nuisances. These are all public, governmental

duties, because such as every good government considers itself bound to exercise for the protection and benefit of *all* its citizens, and because recognized as such by the people and government of the state in their legislation, and their performance imposed as a general duty upon all the towns, as upon officers of the law. But on the other hand, there are a great number of special powers granted in the charter which are strictly privileges, such as those relating to sewerage, lighting the city, furnishing it with water, providing public parks, controlling its trees whether public or private property, providing and controlling its burying grounds, controlling and licensing carriers, and in very many other respects controlling and regulating the manner in which individuals shall use their own property, or conduct their own business, even upon their own premises. These and other like powers, constituting two-thirds of those contained in the charter, are not governmental in their nature, are not such as the people of the state generally, as embraced in the ordinary municipal agencies, require or possess, and not such as governments generally, or the government of this state, have ever assumed to exercise by the towns, or other general municipal agencies, or would exercise on the territory embraced by the city as a governmental duty, if the city did not.

The foregoing contrast of the two classes of powers and duties suggests the line of distinction between them, and further suggests, what in my judgment is true, that there is no mode by which to determine whether a power or duty is governmental or not, except to inquire whether it is in its nature such as all well ordered governments exercise generally for the good of all, and one whose exercise all citizens have a right to require directly or by municipal agency, and whether it has ever been assumed or imposed as such by the government of this state, and would have been exercised by the state if it had not been by the city. Tested by these criteria the extinguishment of fires is not a public, governmental duty.

Fires are sometimes set by incendiaries, but generally they are accidental. They belong to the chapter of accidental calamities, which when they occur arouse the instinctive apprehension and sympathy of neighborhoods and local commu-

nities, and impel them to voluntary exertion and effort to control them. In most of the towns now, and in all until a period not very remote, men gather at the alarm, and work as they do when a building falls and buries its inmates, or a well caves and buries those who are digging it, or children stray and are lost in the woods, or a hurricane dots the shore with stranded vessels and endangered mariners, whose lives depend upon the surf-boat, and the stout hearts and strong arms of the shoremen.

All voluntary effort by numbers of men, whether in the direction of good government, education, benevolence, charity, or neighborhood assistance in case of accident, is most efficiently rendered by them when associated and organized. This is especially true in respect to accidental fires, the prompt extinguishment of which requires the previous preparation of implements, and the skill and experience acquired by training in the use of them. Hence, although very few—not more than four or five—of the thirty-seven of the states of the Union have assumed to provide, through their municipal agencies or otherwise, for the extinguishment of fires as a governmental duty, many of them have aided associations for that purpose, by acts of incorporation, by exemptions operating by way of bounty, and by making free grants of all the necessary power to special municipal corporations, when requested by them to do so. Massachusetts early adopted a general compulsory fire system, and provided for the election of fire officers by towns. Maine when set off retained the Massachusetts law. Vermont has recently adopted something of the same character; but I know of no other state that has. New Hampshire has no law excepting one authorizing the towns by by-law to regulate the setting and guarding of voluntary fires in clearing land. Rhode Island has a general provision by which all associations, benevolent, charitable and educational, including fire companies as of the same general character, may have corporate powers. Connecticut has never assumed or recognized the duty as a governmental one, but has simply aided voluntary organization and effort when desired. In 1784 the cities of Hartford, New Haven, Middletown, New London and

Norwich were chartered with like powers and privileges. Among their enumerated privileges, to be exercised by suitable by-laws, was one relative to " sweeping of chimneys and preserving said city from fire." No *duty* in relation to fires was then or has since been *imposed* on them, or any municipal. corporation. In 1803 the first fire company was incorporated, on the petition of citizens of Wethersfield, and during the next thirty years many others were authorized in like manner. But as the business of insurance grew and acquired public confidence, most of the old companies died out, and the number since chartered and now existing is believed to be less than it was thirty years ago. Some of the boroughs, many of the densely populated villages, and one of the cities, are without fire departments, or companies, or even engines. Their reliance is not upon such agencies, so much as upon insurance. Certainly the idea has not entered their heads, or those of the people generally, that the extinguishment of fires is a governmental duty, and they have a right to call on the state to exercise it and protect them. Undoubtedly it is a matter which the state *may* assume and impose upon its municipal corporations, but the state has not done either, and it is not consistent with principle for this court to hold corporate officers appointed merely to carry into effect the privileges and powers of the corporations, to be officers of the law, and as such entitled to governmental immunity.

Such were the views which I entertained when this case was consulted and decided. Since the opinion of the court was written I have carefully examined it, without finding anything which satisfies me that it is my duty to change them.

The opinion is lengthy, but if I comprehend its intended logic, so far as it bears upon the question, it is, first, that the state has recognized and assumed the duty of extinguishing fires by various enactments which are specified, and second, if it has not done so it has been remiss, for that the duty is in its nature a governmental one. But in my judgment neither position is sustained or sustainable,

The first class of enactments relied upon is that by which fire companies have been chartered, and special grants made to

corporations of the powers necessary for the extinguishment of fires. · I am unable to view those *special* grants as evidences of the assumption or recognition of a *general duty.*   They are not *impositions*, but *privileges*, granted in the same manner as privileges are granted to other associations or corporations, or as other powers and privileges not governmental are granted.

Another enactment relied upon is that by which the legislature have exempted firemen from military and jury duty and poll tax.   The two former were mainly intended to prevent the firemen from being called away.   The latter, and to some. extent the two former, undoubtedly operate as bounties.   But what then ?   The granting of bounties is not proof of an assumption or recognition of a governmental duty.   Exemptions in favor of charitable and benevolent associations are to be found in our general tax laws, and gratuities are given in the same way to county agricultural societies, &c.   Bounties too have been given by general law within the present century to encourage the growth of flax and hemp, not only by exempting the land from taxation, but by a cash payment of $10 per ton from the state treasury.   (Stat. of 1808, 374.)   Could it be gravely contended that such an act was an assumption of the duty of raising flax and hemp as governmental, and that the farmer who raised it was an officer of the law, and if his servant negligently drove against a carriage while transporting the hemp or flax from the field or to the market, the master was entitled to governmental immunity ?   Again, we have had in force during the present century general laws giving bounties to those who should kill wolves, foxes and crows.   If a man had sallied out with his servants in pursuit of either, would they have been engaged in a governmental duty ?   And if a servant had been sent back for a forgotten article, and told to hasten, and on his way had negligently upset and injured a traveler, could the master escape liability on the ground of governmental immunity ?   It seems to me the answer to these questions should be deemed a conclusive answer to the claim suggested.

Reliance is placed also on a recent act creating fire marshals in boroughs and cities.   But that act has no reference

whatever to the *prevention* or *extinguishment* of fires. It provides for an inquiry into *their cause after* they have *occurred,* in order to detect the criminal if thought incendiary, or the fraud, if supposed by insurers to be fraudulent. It has no bearing whatever upon the question.

The court also seem to rely very much upon the amendment made to the charter in 1862, which provides for the organization of a fire department. I see no force in the claim. It was in the form of a resolution, and it related to the city of New Haven alone, and merely made a part of the charter specifically that which had previously existed as a by-law. It was conceded in the first argument of the case that the amendment was solicited by the city authorities, and made imperative because the system was new and expensive, and the by-law by which it was adopted could be repealed at any time, and there was danger that the system might not have for those reasons a fair trial. And so the legislature, in *aid* merely of the city authorities and the object sought, made the specific provisions of the by-law an imperative part of the charter. It seems to me absurd to claim the passage of such a resolution, under such circumstances, as a recognition of a general duty.

The second ground on which the decision is placed, is that the duty is governmental in its nature, because fires in large cities may be so extensive as to affect the public generally. That such fires have occurred under a peculiar combination of circumstances, and seriously affected the creditors and insurers of those whose property was destroyed, and to some extent other classes, is undoubtedly true. But what then? What creates the public duty? Most fires, whether large or small, affect to some extent the creditors and insurers of those whose property is burned. A public governmental duty reaches to all, and the effect of this decision will be to confer immunity upon *all* corporations, and their officers and firemen, under *all circumstances.* What matters it then whether the fire is large or small? The immunity, if it depends on a *public* duty to all, does not depend upon the magnitude of the fire or of the danger. The danger is undoubt-

edly greatest in large cities; but how is that peculiar danger created? Clearly by the citizens themselves. They have built compactly upon *narrow* streets, and built *connected* blocks of buildings, elevated beyond the reach of ordinary appliances for extinguishing fire, and liable to be swept irresistibly by that element wherever it originates, when the cold is so intense as to prevent the free use of water, as in New York in 1835, or there is a combination of drouth and high wind, as in Chicago last year. Does the danger *thus* created *impose* a general duty upon *the state*? And if the general duty exists, should it not be exercised to *prevent* the danger, by preventing the inhabitants of cities from recklessly creating this danger to the community as well as to themselves? In my judgment it is illogical to argue the existence of this duty from the existence of the danger thus created. It is equally illogical to claim the duty on the ground that creditors, insurers and other classes of the general public, are indirectly and remotely affected. If the interest of the owners of the property does not demand or create it, certainly the remote interest of others cannot do so. Moreover the chances of just such a fire enter into the speculations of the insurer, and are covered by his premium. The danger of loss by fire, and consequent failure, is calculated by the creditor, and covered by his profit. So of all classes of society. All contemplate, or may contemplate, the contingency, and none of them contemplate that the government has exercised, or is bound to exercise, any duty in relation to the matter, except to grant as a privilege to the inhabitants of the city all the powers which they may think necessary to guard against the danger which they in their greed have created.

But there is another aspect of this matter. The danger thus recklessly created by the inhabitants of a city ought not to entitle them to immunity for the negligence of their servants. The lives and limbs of those who are compelled to enter the city from without, or are enticed there for purposes of trade, or education, or pleasure, should be protected. About the same time that the plaintiff in this case was injured, a lady was recklessly killed by a body of firemen in the city of

Hartford.  The community generally require protection in this matter, and the legislature have wisely avoided any grant or recognition of immunity.  An alarm of fire may be given in a large city when the streets are filled with men, women and children and carriages, and the sudden rush of the firemen and engines may come unanticipated and recklessly among them.  It is the duty of firemen to reach a fire as soon as possible.  It is equally their duty to avoid injuring the people who are thus lawfully in the streets.  Firemen, of all other men, should therefore be not only energetic on the one hand, but considerate and careful on the other.  Shall we leave it to these corporations to select, instead of such men, who are expensive, cheaper men or party favorites who are not reliable, at their discretion, under the protection of a perfect immunity ?  Or shall we hold them responsible for the choice, by holding them responsible for the negligence of those they employ ?  I cannot bring my mind to extend to these corporations an immunity which the legislature have not conferred upon them, or recognized as belonging to them, by uniting in a decision which I must think a departure from principle, and an act of unwise judicial legislation, conferring immunity where the legislature have not contemplated or intended it.

Three cases are cited by the majority of the court in support of their decision, but they furnish it no support.  None of them hold that immunity exists in a case like this.  The Massachusetts case of *Hafford* v. *New Bedford* was based upon the fact that the legislature of Massachusetts had assumed the duty as a public one, and imposed it compulsorily upon all the municipal corporations of the state.  No such recognition and imposition have been had here.  The decision cited from Daly was placed expressly upon the ground that the relation of master and servant did not exist.  For although the city accepted the firemen and owned the engines, there was *no employment*, and their action was *in aid of voluntary effort* merely.  I have concurred with the court in a decision substantially similar—that of *Torbush* v. *Norwich*.  The case cited from 19 Ohio was also unlike this.  The action there was for nonfeasance.  The city was sued because it had not made

sufficient provision to put out fires. The court held that the extent to which the city should go in providing engines and firemen, and the character of either which they should provide, was a matter of legislative discretion, and not of imposed duty, and the decision was right. Corporations are not liable for nonfeasance in such cases, for the powers granted them are privileges to be exercised at their discretion, and they are liable only for misfeasance. There are dicta in some of those cases which are extracted in support of this decision, but if they have any bearing upon this case they are *obiter*, and undeserving of consideration.

A case is supposed of a building in a city which is threatened by rioters, and protected by police, and later in the day is threatened by fire, and protected by firemen. It is asked, where lies the difference? The answer is, the city police are officers of the law. They are performing a duty which the state recognizes as governmental, and by its constables and sheriffs would perform if the city did not. The firemen, if employed servants of the city, are doing that which the state has not recognized as its duty, and would not perform if the city did not. One is a crime, the other an accident. And this answer is applicable to other cases put in the opinion.

It is said that the reason why there is no public statute making provision for the extinguishment of fires in the towns generally, is that in the country fires do their work too rapidly, the danger of extension is less, and the expense is not justified. But the state has very many compact, central villages, and compact, manufacturing villages, where, under peculiar circumstances, losses by fire may reach into the hundreds of thousands, though not into the millions, and where there are no distinct organizations for the extinguishment of fires. The people know nothing of legislative duty in the matter, and ask no legislative grant, but rely on private precaution, neighborhood assistance and insurance. The state, recognizing no governmental duty in the matter, leaves them and their creditors and insurers to such reliances, as it would have left the defendant city if it had not solicited the requisite power to protect itself.

It is suggested that a burning building is a public nuisance, and that the corporation should be exempt for the negligence of their firemen, because employed in abating a nuisance. The idea is, I believe, novel. It did not occur to counsel on the argument, and does not in my judgment deserve serious consideration. Saving property from accidental and elemental destruction, and destroying it because a public nuisance, are very different things. All fires are not dangerous even to the building in which they originate, but most of them are extinguishable with partial loss or injury. The suggestion of the court assumes *all* to be technically public nuisances, and applies the general technical doctrine of immunity to *all*. I cannot concur in it.

For these reasons I must dissent.

In this opinion CARPENTER, J., concurred.