THE TOWN OF ROCKY HILL vs. MARTIN T. HOLLISTER.

Hartford Dist., May T., 1890. ANDREWS, C. J., CARPENTER, LOOMIS,
SEYMOUR and TORRANCE, Js.

The selectmen of two towns on opposite sides of the Connecticut river,
leased a ferry between the towns to the defendant, under a written
agreement by which it was to be operated and maintained by him for
ten years and he was to receive all the tolls and to pay each town
twenty dollars a year. The towns had by votes authorized the select-
men to act in the matter, and they had leased the ferry to the defend-
ant as the highest bidder for it. These votes of the towns were passed
at meetings in the warnings of which the subject was not mentioned,
but the towns afterwards permitted the defendant to run the ferry
and take the tolls, and the plaintiff town had by a valid vote instruct-
ed its selectmen to bring suit upon the contract for the annual payment
due it, which the defendant refused to make. In a suit so brought it
was held—

1. That the acquiescence of the towns in the running of the ferry by the
defendant, and on the part of the plaintiff town the vote directing the
bringing of the suit, constituted a ratification of the action of the
selectmen in making the lease.

2. But that the towns, and the selectmen as their agents, were bound to
maintain the ferry, and in the absence of all instructions from the
towns the selectmen had power to contract with some responsible
third party for the performance of the duty.

3. That the duty to maintain the ferry being cast upon the towns by law
carried with it the right to perform the duty in such manner as they
thought best, so long as there was no law or rule of public policy to the
contrary and it was performed to the satisfaction of those having occa-
sion to use the ferry.

4. That there was no law nor rule of public policy which forbade them to
perform it by such a lease as they made to the defendant.

5. That there was no law that prohibited the towns from running the ferry
at a profit, the legislature regulating the matter of tolls, and what they
could do directly they could do indirectly by contract with the lessee of
the ferry.

6. That it was no valid objection to the lease that it was put up at auction
and given to the highest bidder.

7. That the defendant by being appointed the ferry-keeper did not become
an officer or agent of the towns, but only a contracting party.

The ferry had been the private property of an individual, who had aban-
doned it. Held that the duty of maintaining it was cast by law upon
the towns, and that this duty carried with it the right to take and ap-
propriate the lawful fees.

[Argued May 6th,—decided September 12th, 1890.]

ACTION to recover two annual payments claimed to be due the plaintiff town from the defendant as lessee of a ferry; brought, by appeal from a justice of the peace, to the Court of Common Pleas of Hartford County, and there tried to the court before *Bennett, J.* Facts found and judgment rendered for the defendant, and appeal by the plaintiff. The case is fully stated in the opinion.

*A. P. Hyde* and *W. S. Goslee,* 'for the appellant.

1. It was competent for the two towns, after taking possession of the ferry upon its abandonment by Boynton, to become vested with the ownership of all the title and interest which Boynton had had in the ferry. Under the provisions of our statute, § 2769, if the commissioners on this ferry had performed their duty in giving proper notice to Boynton to perform his duty, all his interest in the ferry would have become vested in the towns at the end of thirty days, without any action of theirs other than taking possession of and running the same. It will not be questioned that a release of all his interest to the towns by Boynton would have been valid. We claim that it is equally clear that the total abandonment of the ferry by Boynton for more than twenty years, and the exclusive use of the ferry by the towns as their own for the same period, vested the same interest in the towns by prescription and user. Washb. on Easements, 125; 1 Rev. Swift's Dig., 165; *Com.* v. *Low,* 3 Pick., 408, 412; *Sherwood* v. *Barlow,* 19 Conn., 471; *Sherwood* v. *Waller,* 20 id., 268. The non-user by Boynton for more than twenty years was an abandonment of all interest in the ferry. *Corning* v. *Gould,* 16 Wend., 531; *Hartford Bridge Co.* v. *East Hartford,* 16 Conn., 149, 173.

2. The court below erred in ruling that the use of the ferry by the towns since the abandonment by Boynton, being a duty imposed by law, could not be hostile or adverse, and that Boynton remained the proprietor of the franchise until 1889, and that the towns had no other authority over the ferry than the duty imposed on them by law to keep and maintain it for public convenience. The duty to maintain

the ferry, as imposed by statute, is entirely independent of the question whether the ferry is owned by the towns or by others. The statute liability is the same whether the ferry is owned by the towns or by individuals. The fact that in 1866 the towns contracted for the use of the ferry for ten years was clearly adverse to and inconsistent with any right of Boynton to resume the ferry at his pleasure, and the same may be said of the two subsequent leases, each for the term of ten years.

3. The court erred in holding that the towns have no power to lease a ferry, reserving rent therefor, and that their duty being imposed by law to keep and maintain the ferry deprives them of any right to make any profit from the operating of the ferry. Towns owning or operating a ferry can only do so through the intervention of agents, and there can be no reason shown why, if they provide for the running of a ferry, they should not be able to do so as readily by lease as through the employment of mere servants to take charge of the ferry. That the primary duty of the town as the owner or operator of a ferry is to serve the public interests as public convenience or necessity may require, may well be admitted. It may amount to a burden and expense, as it is in this case, but, at the same time, it may be in the hands of the town a valuable franchise and produce a profit. *East Hartford* v. *Hartford Bridge Co.*, 17 Conn., 91 ; *Fay* v. *Petitioners*, 15 Pick., 243. The tolls authorized to be taken at this ferry are established by the legislature, and so long as the towns run or cause this ferry to be run, they have a right to receive the tolls thus established. Whether the undertaking results in loss or a profit depends upon the prudence with which the ferry is run and the amount of tolls which may be received. If the tolls are unnecessarily large and oppressive to those who use the ferry, or are unduly remunerative to the operators of the ferry, the sole remedy lies with the legislature to reduce them. It would seem entirely reasonable that if the towns had at large expense established a ferry satisfactory to the public, they should have a right to remu-

nerate themselves, from the legal tolls received for running it, for the expenditures they had incurred.

4. We think the court clearly erred in not holding that the defendant was estopped from denying the title of his lessors. A tenant is estopped from denying the title of his landlord. This is a universal rule.

*L. E. Stanton* and *J. A. Stoughton*, for the appellee.

1. The town of Rocky Hill has no right to demand rent for a ferry which it does not own. It is not found that this town, at the date of the agreement on which suit is brought, owned a boat, or landing-place, or any appurtenances whatever of the ferry. In point of fact the defendant owned the boat and all appurtenances. It is found that from April 10th, 1886, he has paid all expenses, and the written agreements provide that the towns shall be saved from all cost to them. Ferries in this state are of two kinds: those which belong to a town, and those which are owned by private persons. *Hartford Bridge Co.* v. *East Hartford*, 16 Conn., 149; *East Hartford* v. *Hartford Bridge Co*, 17 id., 79. Ferries exist by grant from the legislature. They cannot be set up without such grant. They are like toll-bridges, local burdens upon the towns. They are not the property of the town except by virtue of express grant to it. They are not a source of profit to towns except when the legislature has so directed. *Hartford Bridge Co.* v. *Union Ferry Co.*, 29 Conn., 210. The franchise of the Rocky Hill ferry was granted to Jonathan Smith in 1724. 6 Col. Records, 468. And afterwards, in 1728, to his son, Nathan Smith, the father having become disabled. 7 Col. Records, 187. After the death of Nathan Smith, in 1734, it was granted to Hezekiah Grimes, "during the pleasure of this Assembly." 7 Col. Records, 506. This license has never been revoked. The town has no statutory authority to charge rent for the ferry. Towns have no powers except those conferred by express enactment or necessary implication. *Turney* v. *Bridgeport*, 55 Conn., 412. Towns are to raise money by taxation equally upon all property alike. They are to raise no more than sufficient for

public purposes. They are not adapted to carry on trade and rent property. They cannot erect buildings for the purpose of renting them. Public officers are not agents of the town; they are agents of the law. *White* v. *Stamford,* 37 Conn., 578; *Morgan* v. *Berlin,* 46 id., 497; *State ex rel. Coe* v. *Fyler,* 48 id., 145. A town cannot maintain an action, even upon express contract, not warranted by the statute. *Inhab. of Haverhill* v. *Gale,* 103 Mass., 104.

2. It is claimed that the town has gained a right to the ferry by adverse possession. We reply that no statute has authorized a town to gain title to a ferry by a mere entry and possession, or by adverse use. But the finding upon this point is directly against the plaintiff. It is not true that the towns used and operated this ferry as their own property or at their own expense. Each of the leases specially provides that the towns are to be saved harmless from all expense. Except those incurred from 1864 to 1866, not a dollar of charges have the towns paid for the ferry. From 1866 to the present time the towns have not asserted that this ferry is their own property, nor done any act tending to maintain such assertion. No demand for rent was ever made until about the time of the execution of the contract of March 27th, 1886. The possession of the town of Rocky Hill had never been hostile to the title of the true owner. An entry, in order to be adverse, must be such as will afford a cause of action to the true owner. Possession is not adverse when the party comes in under any title other than his own, or one which is consistent with that of the true owner. Tyler on Ejectment, 859; *Abell* v. *Harris,* 11 Gill & J., 371; *Cooper* v. *Smith,* 9 Serg. & R., 26; *Harvey* v. *Tyler,* 2 Wall., 328. No mere claims or acts which do not invade others' rights will avail. *Hanchett* v. *King,* 4 Day, 360; *Parker* v. *Hotchkiss,* 25 Conn., 321; *Huntington* v. *Whaley,* 29 id., 391; *Tracy* v. *Nor. & Wor. R. R. Co.,* 39 id., 382. In this case the towns were compelled, under sections 2768 and 2772 of the General Statutes, to cause this ferry to be run and operated for a certain time. But no right of action ever accrued in favor of Boynton. The towns entered upon his ferry and

operated it in obedience to the mandate of a public statute. They did not commit any trespass, he gained no right of action, and therefore their possession was not adverse.

3. It is claimed that the plaintiff is a landlord and the defendant a tenant, and that the tenant shall not deny the title of his lessors. To this we reply that the relation of landlord and tenant does not exist in this case. The papers are called leases, but they are not leases. They are nothing more than writings by which the towns exercised their power to appoint ferry-keepers. The contract of March 27th, 1886, is not a valid lease, because there was no legal warning that any vote would be offered in town meeting to authorize the execution of a lease. Where the warning is not legal it is well settled that there is no legal vote. An attempt is now made to escape from this rule by means of a certain vote passed after this controversy arose, and which merely directs that suit be brought. We think this ingenious attempt to evade the law will not prevail. Again, the public duty to cause a ferry to be operated is not the proper subject of a lease. The town has no estate in the premises sought to be demised. A lease is a contract by which a person having an estate in premises conveys some portion of it in consideration of rent. Burrill's Law Dict., *Lease ;* 1 Washb. Real Prop., 291. No law has ever given to Rocky Hill any estate in the ferry. Indeed, the town refused to take any estate in it when a plain method by which to gain title was pointed out in the. statute. This is not to deny a landlord's title. It is to deny that towns, being creatures of limited powers, have the right to rent property or to become landlords without the authority of law. A ferry is a highway, and no authority is given by statute to lease highways and demand a rent for the use of them. *Hartford Bridge Co.* v. *Union Ferry Co.*, 29 Conn., 229. Selectmen are annual officers, and have no right to make ten-year leases without authority. A statute was required to authorize towns to let out for five years the repair of the highways. Gen. Statutes, § 2665. A party who is charged as a tenant may deny the legality of the alleged lease. *Satterlee* v. *Matthewson*, 13 Serg. & R., 133. " One

who usurps the right to keep a public ferry in violation of law, and leases the same, cannot claim from his lessee the allegiance due from a tenant to his landlord so as to estop such lessee from disputing his title." *Milton* v. *Haden*, 32 Ala., 300. See also *Croade* v. *Ingraham*, 13 Pick., 33; *Christie* v. *Malden*, 23 W. Va., 667. Can towns by adverse possession gain title to the parks, the public squares, to the land on the highways between the traveled path and the fences? Can they lease out such lands for a profit? Does the rule that a tenant cannot deny title have any application to such a case?

4. The ferry-keeper is a public officer and his duties are those which pertain to an office. " The right to the ferry, the franchise in perpetuity or for an indefinite period, like a grant of this nature from the crown, which is a species of private property oftentimes of great value, the public do not part with. The license is in the nature of an appointment to an office having certain fees annexed, to be held at the pleasure of the appointing power." *Day* v. *Stetson*, 8 Maine, 365, 370. There can be no pretense that the town is the keeper. The towns have never been the keepers of this-ferry. They have in these contracts put upon the defendant every obligation of a keeper which could possibly be named. If the defendant must pay all expenses and take all the risks, and then pay over to the towns the sum of four hundred dollars, it follows that the compensation of a public officer is just to that extent abridged. To make such conditions upon the appointment of a ferry-keeper was an abuse of power. A bond with illegal conditions was demanded and obtained from a public officer. He gave the bond in order to save his place and salary. Held that the bond was invalid, and the signers not estopped to deny it. *U. States* v. *Tingey*, 5 Peters, 115. The selectmen had no right to put up at auction the appointment of a ferry-keeper. Town offices and appointments to office are not to be sold out in this way. Thus the office of constable and collector is not to be made the subject of bargain and sale on the part of the town. *Inhab. of Spencer* v. *Jones*, 6 Gray, 502; *Town*

*of Meredith* v. *Ladd*, 2 N. Hamp., 517 ; *Carleton* v. *Whitcher*, 5 id., 196. Could the selectmen lease out the town pound, taking part of the keeper's fees by way of rent, and then justify the transaction as lawful on the ground that a tenant cannot deny the title of his landlord ? Can they let the office of constable to the person who will abate most from the fees of the office and pay them over to the town ? We insist that the ferriages are by statute annexed to the discharge of the duty. The passengers have been transported by the defendant and all the fees belong to him.

TORRANCE, J. The principal facts in this case are the following :—A public ferry has existed between the towns of Rocky Hill and Glastonbury since the year 1724. Prior to 1864 it was operated by private parties, who claimed to own the ferry franchise subject to legislative control. About the year 1860 one Killam operated it, and early in 1864 all of his rights in the franchise and ferry property came into the possession of one Boynton. The latter operated it until July or August of that year, when he took off his ferry-boat and kept it away for about one month. At this time the towns aforesaid obtained an injunction against Boynton to restrain him from removing his ferry-boat, but the suit was soon after withdrawn. During said month the towns procured a flat boat and operated the ferry at their own expense. At the end of the month Boynton returned his boat and continued to maintain the ferry till the spring of 1865, when he permanently removed his boat and has never since kept or operated the ferry. Thereupon the two towns operated the ferry till April, 1866. The fares were insufficient to meet the operating expenses. On the 10th of April, 1866, the towns, through their selectmen empowered thereto by a vote of the towns, made a written contract with Killam to construct a steam ferry-boat, and maintain the ferry at his expense for the term of ten years, he to collect and retain the tolls, to save the towns harmless from loss, and to be paid by each of the towns in addition five hundred dollars. Under that contract Killam operated the ferry till April 10th,

1876. In November, 1875, a like agreement, except that the towns were to pay nothing, was entered into between the towns and Killam and the defendant, for a term of ten years. Under that contract the ferry was operated after April 10th, 1876.

At an adjourned town meeting of Rocky Hill in October, 1885, it was voted that its selectmen take measures to sell the right and privilege of running the ferry to the highest bidder. In the same month Glastonbury voted to leave the matter of leasing the ferry to its selectmen, with power to act. No notice that any such action would be taken was inserted in the call for either of these meetings. In February, 1886, the selectmen of both towns, acting together, gave public notice of the time and place at which they would receive bids for the right and privilege of operating the ferry for ten years. The defendant bid four hundred dollars, and this being the highest received, he was awarded the contract.

In February, 1886, Hollister bought all of Killam's interest in the ferry and ferry property, and operated the ferry alone till April 10th, 1886. On the 27th of March, 1886, the written agreement sued upon, and set out in full in the complaint, was entered into between the two towns on the one part, by their selectmen, and the defendant on the other. It purports to be an indenture and agreement of lease, is signed and sealed by the defendant, and is signed by the towns by their selectmen, but is neither witnessed nor acknowledged. By it the towns agree to lease the ferry to the defendant, to be operated by him for the accommodation of the public "in as full and ample a manner as said parties of the first part could do if they conducted and managed said ferry," for ten years from April 10th, 1886. The defendant, among other things, agrees, "in consideration of having the right to use, keep and maintain said ferry, and of receiving the income and emoluments thereof," to 'pay to each of the towns the sum of twenty dollars per year for the lease of the ferry, for said term, "to be payable to the respective treasurers of said towns for the time being, on the first day of January in each and every year of said term."

Under this agreement the defendant began to operate the ferry from and after April 10th, 1886, and continued to operate the same, and to take all the tolls to his own use, up to the time of this suit, but refused to pay the sums agreed to be paid yearly to the plaintiff; and this suit is brought to recover two of the yearly payments.

At a special town meeting of Rocky Hill, duly warned for that purpose, held in December, 1887, the town agent was by vote directed to bring a suit against the defendant in the name of the town, " to collect the rent due this town under the lease executed by the selectmen of this town and the selectmen of Glastonbury, of the Rocky Hill ferry, to Martin T. Hollister, dated the 27th day of March, A. D. 1886, and to enforce the provisions of said lease, or to take steps to terminate the lease according to the conditions of said lease." On the 31st of January, 1888, Boynton by deed quit-claimed all his right, title and interest in the ferry to the defendant. The court below finds that " Boynton's interest in said ferry has never been forfeited and become vested in the towns of Rocky Hill and Glastonbury in the manner provided by statute."

Upon these facts the court below rendered judgment for the defendant. In the view we take of the case we think this judgment is erroneous.

If it be admitted for the sake of the argument, as the defendant claims, that, at the time when the contract sued upon went into effect, Boynton had not abandoned or lost his rights in the ferry, and the towns had not, as against him, acquired any right, title or interest therein; and further, that towns have only such rights and powers as are conferred upon them by law, expressly or by necessary implication, we still think the judgment below was erroneous.

When Boynton ceased to maintain the ferry in 1865, that duty was by law cast upon the towns, and remained upon them so long as Boynton refused to perform it. That duty carried with it the right to take and appropriate the lawful fares. As against every one except Boynton, even on the defendant's claim, the towns in April, 1886, had the sole

and exclusive right to operate the ferry and take the fares therefor. The duty to maintain the ferry being cast upon the towns by law, carried with it, in the absence of any law or rule of public policy to the contrary, the right to perform the duty in such manner as they thought best, so long as the duty was performed to the satisfaction of those having occasion to use the ferry. In the absence of such law or rule the towns could operate the ferry through the agency of their own officers and servants, or through the agency of third parties responsible to the towns alone for the performance of that duty. The law casts upon towns various duties, such as the making and maintenance of highways and bridges, and the care of paupers, and in the absence of laws providing how these duties shall be performed, or of known rules of law or public policy forbidding it, towns have performed these duties in ways analogous to that adopted by the towns in this case for the maintenance of this ferry.

We know of no law that directs the way and manner in which these towns shall operate this ferry or that forbids them to manage it in the way it was managed by them from 1865 to 1886, nor are we aware of any sound rule of public policy that is or can be violated by permitting them to perform it in this way.

Confessedly the maintenance of the ferry is a burden imposed upon these towns, not alone for the benefit of the inhabitants of the towns, but of the general public as well. As some compensation for this the legislature gives the towns the right to take the tolls, which are fixed by law and may be changed or abolished at pleasure. If under these circumstances the towns deem it best for all concerned to let to some third party, responsible to themselves upon his contract, the right to run the ferry at his own expense, taking the tolls as full compensation, who is or can be harmed? Not those having occasion to use the ferry, for they in no event pay more than the toll fixed by law, and to them the towns still remain responsible for the due and faithful performance of this public duty. Not the state, for in this matter it still deals directly with the towns and knows nothing

about the party contracted with, and can change or abolish the tolls at its pleasure. Not the towns, for it may be presumed that they would not enter into such an arrangement if it were not beneficial. Not the party contracting, for if he voluntarily makes such a contract, and is simply obliged to perform it, he can suffer no legal harm.

If then these towns saw fit to perform this duty by contracting with some party responsible to themselves for its due performance, upon terms agreed upon, and the contract contains no provisions contrary to law or to the sound rules of public policy, and no one concerned is or can be harmed thereby, we think they had the right and power to do so.

The next question is, whether the contract in the present case contains any such objectionable provisions. It will be noticed that the contracts of 1866 and 1875 required no payments to be made to the towns by the contractor, while the contract sued upon requires such payment, and many of the objections to the validity of the present contract are based upon this difference. The defendant says the towns cannot by law lease this ferry for profit. Under the circumstances this objection is not a valid one. We know of no law tha' prohibits the towns from running the ferry at a profit. If they maintain it themselves, it is certainly possible that they may make a profit. In such case they may surely appropriate such profits. What they can thus do directly, they may do indirectly, in the absence of any legal prohibition, and we know of none such. To permit the towns to do this has no tendency to injure the public service or to harm any one. If the legislature thinks the public are paying too much for the service rendered at the ferry, it may be trusted to apply the proper remedy.

The defendant seems to think that in entering into such a contract the towns in effect appoint a ferry-keeper for the town, and he claims that they have no right to put up such appointment at auction and sell it to the highest bidder. He asks whether the towns could thus lease out the town pound or the office of constable to the person who will pay the most money for the position.

In the case before us the towns did not, in the sense claimed, appoint the defendant a keeper of this ferry in 1886.   The defendant was not a mere ferry-keeper of the towns.   He was an independent contractor, acting for himself and his own advantage, and dealing with the towns, not as with a master or principal, but as with a contracting party.   He was in the proper sense of those terms neither an officer, servant nor agent of the towns.   Between such a case and that of a pound-keeper or constable there is no analogy.   The latter are well known officers of the law, whose election or appointment is provided for by law; and well known rules of law or of public policy forbid the sale of such offices or the reception of part of the fees as a reward for appointment.

The defendant further says that, inasmuch as the tolls are public fees annexed to the discharge of a public duty, they belong to the defendant as the person who discharges the duty, and thus to compel him to pay over a part of the fees is to abridge the compensation of a public officer to that extent.

It is doubtless true that, as the actual operator of th  ferry, the defendant is clothed with all the rights and powers which the law gives to one holding that position, an   that extent he may be said to be a public officer.   But it   ould be remembered that he was not appointed by law to this position, nor does the law impose upon him, independently of his contract, any duty to maintain the ferry, or give him any right to take the tolls.   It does not hold him responsible for its maintenance nor for his negligence in managing it.   In fact it does not know him in the matter.   Notwithstanding the contract, the duty and responsibility of running the ferry and the right to the tolls still rest upon and remain in the towns.   It is only by virtue of a contract which he now seeks to repudiate, that the defendant had the right to run the ferry and take the tolls at all.   If he is now compelled to pay for this privilege just what he agreed to pay, neither the law nor the towns can be justly charged with diminishing the fees of a public office, either directly or indirectly.

The objections urged afford no ground for denying to the towns the right and power to make a contract like the one in question.

Assuming that the towns possessed such power, the next question is, whether it was so exercised in the present case that the plaintiff may recover.

To begin with, it must be admitted that if the votes of the towns were necessary to the validity of the contract, it has no validity unless it has since been ratified. The votes for want of proper notice were mere nullities. But the contract, if not binding upon the towns originally, might subsequently become binding by ratification. Now both towns had permitted the defendant to operate the ferry and to take and appropriate all the tolls under the contract since April, 1886. In addition to this, and so far as the plaintiff is concerned, we think the vote passed by the town in December, 1887, ratified and made binding upon the plaintiff the contract in question. Why then should not the defendant pay the sum agreed upon to the plaintiff, at least for the two years before suit was brought, during which he was in undisturbed possession of the ferry and tolls?

But independently of this question of ratification, we think the plaintiff is entitled to recover in this action. The duty of maintaining the ferry had been cast by law upon the towns in 1865, and from that time forward they had directly or indirectly performed that duty. The towns could perform this duty, either directly or indirectly, only through the agency of their officers, and the selectmen were the proper agents of the towns to see that the duty was properly performed. Without waiting for any vote or other action on the part of the towns, the selectmen were bound to maintain the ferry, and, in the absence of all instructions from the towns, we think they had power to contract on behalf of the towns with some responsible third party for the performance of this duty, upon terms similar to those contained in the contract sued upon.

In the case at bar the defendant agreed, if the town would allow him to run the ferry and appropriate the fares to him-

self, to pay to the plaintiff for that privilege the sum of twenty dollars per year. The defendant has been allowed to operate the ferry and take the fares for two years, and we know of no good reason why he should not pay as he agreed for those two years.

For these reasons we think there was error in the judgment of the court below, and it is reversed.

In this opinion the other judges concurred.