*In re* Intervening Petition of PRATT and another, Partners, etc.

KING and others *v.* OHIO & M. RY. Co. and others.

(*Circuit Court, D. Indiana.* July 18, 1885.)

1. NEGLIGENCE — VESSEL PASSING THROUGH DRAW — DUTY OF BRIDGE-KEEPER — FAILURE TO OPEN DRAW — SIGNALS.

 *Semble,* in cases where the draw of a bridge cannot be opened to an approaching boat promptly, the keeper of the bridge, by a proper signal, in answer to the boat's whistle, should give notice of the fact; and again, when ready to open the draw, should give a signal of the fact.

2. SAME — DUTY OF VESSEL.

 Where the only notice a boat approaching with a tow of barges has that a draw will not be opened is seeing it closed, it is not negligence on the part of the boat, after giving the proper signals, and there is no apparent reason why the draw should not be opened, to drop down under the slow bell until reasonable prudence requires a different course.

3. SAME — EVIDENCE — CONTRIBUTORY NEGLIGENCE.

 On examination of the evidence in this case, *held,* that contributory negligence on the part of the boat is not shown, and that the managers of the bridge were negligent, and liable for the injury resulting therefrom.

Chancery. On exceptions to master's report.

*F. Winter* and *U. J. Hammond,* for petitioners.

*Harrison, Miller & Elam,* for respondents.

WOODS, J. The master's report contains a sufficient statement of the case. It is as follows:

"*To the Honorable Court:*

"'This is a claim against the receiver for injuries to a steam-boat and barges belonging to the petitioners, which injury, it is alleged, was occasioned by the negligence of the receiver's employes in the operation of a draw in a bridge over the Wabash river at or near Vincennes.

"'The steam-boat D. A. Goodin was descending the Wabash river between 6 and 7 o'clock A. M. on the fourteenth of February, 1884, the river being at that time at a very high stage. It is alleged that the steamer approached the bridge in the usual and proper channel for passing through the draw, and repeatedly gave the proper signal by sounding its whistle to notify the person in charge of the draw of the bridge of the approach of the vessel, and that it was desired to pass through. It is averred that the receiver's employes failed and omitted to open the draw so as to permit the vessel to pass through, and negligently and wrongfully kept the draw of the bridge closed, by reason whereof the vessel, which had approached nearly to the draw of the bridge before petitioners' employes in charge of the vessel discovered that the draw would not be opened, was carried by the force of the current against the bridge, and was injured, all of which occurred solely by reason of the negligence of the receiver's employes, and without any fault or negligence on the part of the petitioners' employes.

· "There is no dispute as to the injury of the vessel and the barges, nor any serious controversy as to the amount. The items of expenditures for repairs, and the amount of damages, are set forth in the evidence, and I find that the petitioners were damaged by reason of the collision in the sum of $———.[1] But the right to recover at all is strenuously resisted by the receiver.

"The steamer Goodin was used by the petitioners in transporting timber up and down the Wabash river. At this time the Goodin was descending the river, having in tow three barges, which were lashed together and placed in front of the vessel. The vessel was a stern-wheeler. The extreme length of the fleet from the end of the barges to the wheel was 153 feet, the longest barge being 70 feet in length, and the vessel being 83 feet from out to out. The testimony of the pilot of the steamer Bellgrade, which met the Goodin over a mile above the bridge, is that the barges were so heavily loaded that he feared the waves made by his boat in passing would swamp them. About a mile and a half above the bridge there is a bend in the river, and it was about this place where the Goodin, descending the river, met the Bellgrade ascending the river. The meeting boats exchanged the customary signals. This was also about the place where the customary signals were given for the opening of the draw in the railroad bridge. The course of the river from where the boat came in sight of the bridge to the bridge is south. There was a strong wind blowing from the north-west. The boat descended the river with a slow motion, after the first signal was given, to a point opposite or near Tindolph's mill, which is nearly a mile above the bridge, without there being any indication on the bridge that the draw would be opened. At this point the signal was given again by the descending boat, and nothing was done at the bridge indicating a purpose to open the draw. The boat then descended with a slow bell to a place near Barrett's mill, which is about a half mile above the bridge, where the wind and current drove the barges against some rafts and logs on the Indiana shore. At this point the master of the Goodin became alarmed, and signaled the pilot of his boat to "hold the fleet," which meant that he should back and use steam enough to hold the vessel, and keep it from descending with the current, which at that place was pretty swift. He discovered that there was not power enough in the engine to keep the vessel from drifting with the current towards the bridge, although the engineer says he gave it all the steam it would bear. The engineer and the pilot both say that when extra steam was put on the strain was increased, and one of the chains broke. Seeing that the boat could not then be held, the vessel was rounded to, to go to the Illinois shore to a sycamore tree which stood in the water some distance from the west shore, where they hoped to make the boat fast. Just as the turn was made and the boat headed up stream, the key-seat which kept the chain in place slipped off, and the other chain came off the shaft. Being at the mercy of the current, the pilot and engineer got into a skiff with a line or rope, and attempted to reach the tree. The rope was too short, and, just as they were making fast to the tree, the boat had drifted so far down stream that the boat end of the rope, before it was made fast, slipped off into the river. The vessel, with the barges, then drifted against the bridge, and was injured.

"There was nothing to obstruct the view of the vessel from the watch-house on the draw-bridge to the point near and above Tindolph's mill. If the watchmen and others in charge of the draw-bridge had been on the lookout they could have seen the vessel as it approached. From the fact that the place where the steamer Goodin and the steamer Bellgrade met on the river above was about the place where the signal for the draw is usually given, it is probable that the men in charge of the bridge mistook or confused the meeting signals with the signal for the draw, and may have supposed that the descend-

[1] See *infra*.

ing vessel did not intend to pass the bridge at that time. The testimony of the men at the bridge is that they heard no signals for the opening of the draw, and made no effort to open it because they did not suppose the Goodin desired to pass down the river at that time. The master is of the opinion that the men at the bridge were not giving proper attention, or they would have heard the signals to open the draw.

"There was not force enough in the engine of the Goodin to hold it against the current, with the heavily loaded barges which were attached to it. Besides this, the breaking of the chain indicated, either that it was insufficient for the purposes of safe navigation, or had become so by reason of the unusual strain to which it was subjected by the unusual weight of the barges which the vessel was towing.

"Upon the whole case the master is of the opinion, and therefore reports and finds, that, although the employe of the receiver, who had charge of the draw, was negligent, the negligence of the employes of the petitioners in the management of the boat, and the negligence of the petitioners in failing to supply said boat with machinery of the requisite strength, and the negligence of the petitioners' employes managing the boat, and in descending the river with the barges so heavily loaded as to prevent the safe navigation of the river at that stage of the water, materially contributed to the damages and losses to which petitioners have been subjected.

"I therefore report that the claim of petitioners should be disallowed. I append to this report an abstract of the evidence.

"Respectfully submitted.

"WILLIAM P. FISHBACK, Master."

With the burden of proof upon the respondent in respect to contributory negligence, it does not seem to the court that the master's conclusion is the right one. *Wabash, etc., R. Co.* v. *Central Trust Co.* 23 FED. REP. 738. If the boat's chain had not broken, it is not apparent that, after it became evident that the draw would not be opened, the effort to reach the Illinois shore would not have been of easy and safe accomplishment. The evidence shows that before the boat was started that morning the machinery had been carefully inspected—the chain, link by link—and all found to be in apparent good order. The defect, therefore, was a hidden one, and consequently affords no ground for the finding that there was negligence in failing to supply the boat with adequate machinery.

The captain of the Bellgrade thought the barges so heavily loaded as to be in danger of being swamped by the waves from his boat. They were not swamped, and this evidence, at most, tends to show no other undue or improper peril to the navigation of the boat and barges. It was the right of the boat-owners, as against the owners of the bridge, to employ the power of the boat to the fullest extent consistent with a reasonably safe navigation in respect to the bridge, and there is no proof that in this instance more than this was done. On the contrary, only two days before, when the stage of water was not greatly different, this boat, with the same barges loaded to the same extent, passed down safely through this draw. In respect to the wind at that time there is no proof. It is true that on account of passing and approaching railway trains there were times when the draw of the bridge could not be opened without delay, and of

this the masters of descending boats of course had notice, and were bound not to approach dangerously near until assured of an open passage. It would seem to be a better practice that in cases when the draw of a bridge cannot be opened to an approaching boat promptly, the keeper of the bridge, by a proper signal in answer to the boat's whistle, should give notice of the fact, and again, when ready to open the draw, should give a signal of that fact. But no such practice seems to have been adopted, and, so far as is shown, the only notice which an approaching boat could receive that this bridge could not be opened for it, consisted unless a train of cars were seen to be upon or approaching the bridge, in the mere fact that the draw remained closed. The not unreasonable course for a boat in such a case, therefore, was to do as this boat did; that is, after giving and repeating the proper signals, and there being no apparent reason why the draw should not be opened, to drop down under the slow bell until reasonable prudence required a different course. It is not shown that less than reasonable prudence, in the light of known facts, was employed by the managers of this boat. But for the breaking of the chain it is reasonably certain that the boat would have been brought to the shore and safely moored; and the breaking of the chain, as already shown, was so far an improbable and unforeseen occurrence as to afford, either by itself or in connection with the other circumstances, no basis for the imputation of contributory fault on the part of the petitioners.

It is therefore ordered that the exceptions be sustained, and the claim of the petitioners be allowed to the amount proven; and, as the report has been left blank in respect to the amount, it will be returned to the master for correction, unless the proper sum can be inserted by agreement of the parties.