GREENWOOD et al. v. TOWN OF WESTPORT.

(District Court, D. Connecticut. March 8, 1894.)

No. 915.

1. MUNICIPAL CORPORATIONS—NEGLIGENCE—DRAWBRIDGES.
    Defendant town assumed the obligations of a private corporation chartered to construct and maintain a drawbridge across a navigable stream. Neither the corporation nor the town was required by law to operate the draw in such bridge, but after a time the town undertook such operation

by a draw tender appointed first at a town meeting and afterwards by its selectmen. *Held*, that the town, having voluntarily assumed the obligation of operating the draw, is liable for the consequences of its negligence in such operation.

2. SAME—ACTION FOR.
The rule that a private action will not lie against a town for the neglect of a public duty is confined to the case of public governmental duties; while the obligation, voluntarily assumed, of operating a draw in a drawbridge is a mere private corporate duty.

3. ADMIRALTY—MARITIME TORTS—DRAWBRIDGES—TOWNS.
An injury to a vessel from negligence in operating a draw in a drawbridge is a maritime tort, and a court of admiralty will entertain an action against a town therefor.

4. MUNICIPAL CORPORATIONS—NEGLIGENCE—DRAWBRIDGES.
A town maintained and operated a drawbridge across a stream which was navigable only at high tide. Libelant's barge approached the bridge about high water, and signaled for the opening of the draw. The draw tender was absent, and one of the selectmen undertook to open the draw; failing in his attempt, he discovered that it was locked underneath, and he then procured a boat, and opened the draw. In the mean time the barge had been delayed about half an hour, the tide had fallen some six inches, and, while passing through the draw, the barge struck on the bottom, and sank, suffering serious injury. *Held*, that there was negligence on the part of the town.

5. SAME—CONTRIBUTORY NEGLIGENCE.
The proper course of the barge was straight through the middle of the draw. She sunk diagonally across it, and witnesses for the town testified that her master's negligent steering turned her bow to starboard, and caused her to strike the pier. The master denied that he so steered her, and testified that her wheel touched bottom, causing her to strike her port bilge; and her bow took a shift to starboard when the engines were reversed. The shipwright who repaired her testified that her port side was broken, but that she had struck nothing on the starboard side. *Held*, that she was properly navigated through the draw, and the master was not negligent.

6. SAME—BEACHING.
Nor was he negligent in attempting to pass through the draw notwithstanding the fall of the tide, where it appeared that he could neither go back nor turn around, and that it was dangerous to ground the barge on the flats, on account of rocks which would go through her bottom.

7. SAME—UNLICENSED MASTER.
As there was no negligence on the master's part contributing to the injury, the fact that he had no pilot's license is no defense to the town; especially where it was shown that he had passed the draw several times before, and had examined the channel at low water in a skiff

In Admiralty. Libel by Sylvester Greenwood and others against the town of Westport. Decree for libelants.

Carpenter & Mosher and Samuel Park, for libelants.
C. R. Ingersoll and Carter Thompson, for defendant.

TOWNSEND, District Judge. This is a libel in personam against the town of Westport, in the district of Connecticut, to recover damages to the steam barge Hebe, alleged to have been caused by the negligence of said town in not seasonably opening a drawbridge across Westport river, by reason whereof said barge was delayed until she was carried away by the ebb tide, and struck the bottom, and sank. The defenses are denial of negligence, and denial of liability even if there was negligence. The question of jurisdiction has

already been presented upon exceptions, and decided adversely to the defendant. 53 Fed. 824.

The defendant town is located on the banks of Westport river, which is navigable for steam barges such as the Hebe only at or about high tide. In said town, and some 250 to 300 feet above said drawbridge, are certain stores and wharves. At a short distance beyond this point the river becomes a mere shallow stream, and is not navigable. A drawbridge was originally built across said river at the point where the present bridge is located, under a charter granted in 1796 to a private corporation. Said charter provided that the company should make a draw in said bridge "sufficient to accommodate all the navigation which may pass up and down said river," but nothing was said about operating said draw. In 1857, said corporation abandoned said bridge, and the defendant town then took charge of, and has ever since maintained, it. No obligation was ever imposed upon any one to operate said draw, and, down to 1880, the persons in charge of vessels passing through said bridge opened and shut said draw. In 1880, complaint was made that persons passing through said draw did not fasten it properly, and a draw tender was appointed at the town meeting to take care of the draw. After that time a draw tender was appointed at every annual town meeting until recently, when the selectmen took charge of the matter, and employed the draw tender. Such draw tender, with the aid of the selectmen and others, has opened the draw since 1880, and has been paid for such services by the town. It does not appear that any notice of the proposed appointment of such draw tender was inserted in the warning of such meetings, but this does not seem to be material, for, even if such notice might originally have been necessary, the action of the town and of its selectmen since 1880 would constitute a ratification of such appointment. Town of Rocky Hill v. Hollister, 59 Conn. 434, 22 Atl. 290. A further reason why this point is not material is to be found in the fact that the alleged omission to act, or acts of misfeasance, occurred on this occasion when the draw was in the charge of the first selectmen and agent of the town. The town of Westport has never been required by any legislative act to provide an attendant to operate said draw. In other cases where such operation is required, a special provision to that effect has been inserted in the charter for such bridge. The town has provided various kinds of draws at said bridge. The present one was put in some years ago. It is a substantial iron draw, which swings in the arc of a circle, is fastened at the ends, and is so locked, when closed, that it can only be opened by a person who understands how to operate it. The commerce above said bridge is confined to a few vessels delivering coal at the wharves aforesaid in the town of Westport.

On the evening of October 27, 1891, said steam barge Hebe, 97½ feet long and 17½ feet beam, and drawing about 6 feet 4 inches, with Sylvester Greenwood, her master and owner, in charge, having 205 tons of coal on board, consigned to Taylor's dock, just above said drawbridge, reached Saugatuck, some distance below Westport, on said Westport river, and lay there overnight. On the following

morning, at about quarter past 7, she started for Taylor's dock. It was a fair day, and there was a moderate wind from the northeast. She passed through the lower bridge on said river, and, when about half a mile below the upper drawbridge, where the accident occurred, Greenwood commenced to blow his whistle as a signal to open the draw, and kept up the signaling for a considerable time, and until he was close to said draw. Greenwood was an experienced navigator, and had charge of and managed the barge. He had been up this river with similar loads of coal on four or five previous occasions, and was familiar with the channel, and the course and current of the river, and the bottom. He knew that, in order to get through said draw, it would be necessary to reach it when the tide was rising, or at about high water, which would be between 8 and 9 o'clock. It was the first day of the apogee tides. He had always heretofore found the draw open when he reached it, or within a couple of minutes thereafter. The draw tender was not at the drawbridge that morning before or at the time of the accident.

The facts stated above are admitted or proved. As to the state of the tide, and the time when the barge neared the draw, and what then occurred, there is the usual irreconcilable conflict of testimony. Samuel B. Wheeler, the town agent and first selectman, having heard the signals to open the draw, came down on the bridge, and, having secured the assistance of several persons, tried to open the draw. The lever would not move, as the draw was locked underneath. They got a boat, unlocked the draw, and finally succeeded in opening it. Meanwhile the barge had slowed up, and was waiting at a distance of about 75 feet from the drawbridge. When it was opened, she came up into the draw, and, in attempting to go through, and when about half way through, struck and sank. By reason of this stranding, her timbers and sides were broken, and she was badly twisted and strained. The libelant claims that he was delayed about three quarters of an hour by reason of the negligence of the defendant in failing to open the draw, and that, while there would have been an abundance of water if the draw had been seasonably opened, the tide had so fallen while he was kept waiting that, when he got up into the draw, it was impossible to pass through. The defendant denies that it was negligent, and claims that the libelant was not delayed; that the Hebe did not reach the drawbridge until the tide was so low that she could not have passed through; that the libelant was incapable and reckless and "intoxicated or rattled," and so steered the barge improperly; and was negligent in not laying his vessel on the mud flats, instead of trying to pass through; that the defendant was not bound to open the draw; and that it would have been better for libelant and the public travel if defendant had not opened it. The defendant further shows that neither the libelant nor his engineer was properly licensed. The question as to the obligation of the defendant to operate said draw, and its liability for negligence, will be discussed later.

Assuming such obligation to exist, was the town negligent? The only time when said river was navigable for ordinary vessels on said day at said drawbridge was at or about high water. At that time the draw was locked, and fastened at the ends. The draw tender was away. While the town agent and the persons assisting him were opening the draw, the Hebe was delayed for a considerable time, and when she struck, half way through the draw, the tide had fallen at least six inches. It seems to me clear that the town was negligent, and that the injury complained of resulted from such negligence. The town having maintained said drawbridge, under the charter of 1796, which provided that there should be a draw therein sufficient to accommodate all the navigation which should pass up and down said river, and having voluntarily assumed, since 1880, the operation of said draw, failed to exercise the degree of care proportioned to the responsibility assumed and the dangers involved which the law requires under such circumstances. Pennsylvania R. Co. v. Central R. Co. of New Jersey, 59 Fed. 190, affirmed Id. 192; Wiggins v. Boddington, 3 Car. & P. 544; Blanchard v. Steamboat Co., 59 N. Y. 292; In re Pratt, 24 Fed. 335, 25 Fed. 799; Edgerton v. Mayor, 27 Fed. 230; Weisenberg v. Town of Winneconne, 56 Wis. 667, 14 N. W. 871.

The next question is, was the libelant negligent? The only charges of negligence supported by evidence are in not laying the barge on the flats, and in navigating her in the draw. The preponderance of testimony as to the fall in the tide when the barge struck, together with the other evidence as to the time of high water, shows that the barge could have gone through the draw if she had not been delayed. Guyer, one of defendant's witnesses, thinks it took half an hour to open the draw. Kemper, another of defendant's witnesses, says the tide appeared to have fallen six inches or more when the barge struck. Even the absent draw tender, who swore there was not water enough to go through, admits that the average tide under the draw rises and falls about six feet, and that when you can get over the shoal ground below, and to the bridge, you can get through. It is claimed that when libelant found the tide had begun to fall, and the bridge was not opened, he should have backed out and lain on the flats for another tide, as he had done on a former occasion. The libelant claims that he thought he could get through, even then; that he could have done so if he had had an inch more water; that he had been within 75 feet of the draw for 20 minutes before the tide began to fall; and that he could neither turn around nor back out with safety. In this statement he is supported by the testimony of several witnesses. Guyer testified that, although it was all soft bottom below a certain dock, which extends about 250 feet below the drawbridge, yet that a boat which lay on the bottom anywhere between said dock and said Taylor's wharf would be in a dangerous condition. He also stated that there would be a great deal of difficulty in laying a canal boat, all the way up the river, as, if it gets on a stone, the stone will go through it. Other witnesses explain that.

the danger lies in the fact that in the channel and on the flats there are rocks which would make a hole in the bottom of a vessel.

The other claim of negligence is in steering the vessel in the draw. It is agreed that the proper course is straight through the center of the draw. It is further agreed that, after the barge had struck, she lay across the draw in a diagonal position. The libelant claimed that this swinging was caused by the Hebe striking her port bilge, owing to the catching of her wheel in the mud when in the best water in the draw, and that, as her engines were reversed, her bow shifted over to starboard. In this claim he is supported by Buckley, one of defendant's witnesses, who had been in the coasting business for 30 years, and who testified that the barge "looked as though she might have caught her stern on the west side, and her bow swung around against the pier." And Mr. Wheeler, the selectman, who was on the bridge when the barge grounded, testifies that she entered the bridge about in the center of the channel, and that, in his judgment, the boat was steered so, or rather went so, that she struck the abutment, but that he did not know what part of the barge first struck; she might have struck first amidships, or on her port quarter. The defendant claims that the libelant turned the bow of the barge to starboard too soon, and caused her to bring up on the foundation stones of the abutment. The evidence upon the hearing to this effect was largely based upon conjecture. But, after the hearing, the deposition was taken of one Gokey, the shipwright who repaired the Hebe after the accident. He stated that all the damage was on the port side, and that it appeared from the broken planking and splintered and slivered floor timbers that she had grounded or stranded on that side, and that her starboard side was down, making a twist, and that there was no chafe on the starboard side. This testimony, if true, should outweigh the other testimony, for it would be impossible to say, from the movements of the boat, just as she struck, or from her position after she stranded, which of the conflicting claims was correct. I am therefore disposed to accept this testimony, which directly confirms the theory of Capt. Buckley, the witness for the town, whose testimony has already been referred to, and also supports the claim of libelant. There is no evidence that the libelant ported his wheel, so as to throw the bow to starboard. For these reasons, I am of the opinion that the evidence shows that the libelant did not contribute by his negligence to cause the disaster.

Furthermore, while there is no evidence to justify the charge that the libelant was drunk, yet if, as is claimed, he was rattled, and for that reason did not use as good judgment as he might otherwise have used, this is not a defense which ought to avail the defendant in this case. It is well settled that if a plaintiff acts erroneously, through excitement induced by defendant's negligence, or adopts a perilous alternative in the endeavor to avoid an injury threatened by such negligence, he is not guilty of contributory negligence, as a matter of law. "And even though the injured person might have escaped the injury so brought upon him but for his hasty and mis-

taken conduct in the face of danger, yet defendant's negligence is the sole juridical cause of the injury, and plaintiff's error of judgment only its condition, when plaintiff was placed in the position of danger without previous negligence on his own part." 4 Am. & Eng. Enc. Law, 48, and cases cited. Here the libelant had been unreasonably delayed,—slowing up and backing his boat in a narrow, shallow channel, with a falling tide; unable to go backward or forward,—until it became a doubtful question whether he could pass through to his destination or must be stranded. If, under these circumstances of peril, he may have failed to take what subsequent events show might have been a wiser course, the error was one in extremis, and was not a fault. The Thingvalla, 1 C. C. A. 87, 48 Fed. 764; The Chatham, 3 C. C. A. 161, 52 Fed. 396. These considerations seem to dispense with the necessity of guessing out the truth from the mass of conflicting testimony as to the time when the barge reached the draw, the duration of the delay, the hour of high water, the alleged conversation with bridge tenders and selectmen, etc. It is admitted that the tides are irregular, and that the almanac is not a safe guide. The facts found adversely to the town, and which have seemed alone decisive upon the question of negligence, have either been proved by its witnesses or by other unquestioned evidence. I conclude, upon uncontradicted or incontrovertible evidence, that the libelant was delayed at the draw, at or about high water and thereafter, for such a length of time that the tide had fallen so far when he attempted to pass through that he stranded, and that such delay was inexcusable and unreasonable at the only time of day when such vessels could pass through said draw.

Assuming the correctness of the conclusions of fact already stated, there remains for consideration the effect of the failure of the libelant to obtain for himself a license as pilot, or to have some other person, so licensed, on board of said barge. "The mere omission of any or all of the safeguards provided by the federal and state legislatures and the boards authorized to ordain and make laws upon the subject, and a disregard of the laws of the sea, or of the waters upon which the vessel may be, do not, per se, place a vessel thus derelict out of the protection of the law and at the mercy of a wrongdoer, and necessarily leave her remediless for injuries sustained while thus inattentive to laws enacted to secure greater safety in the navigation on the high seas and navigable rivers. The most that can be claimed is that a noncompliance with legal regulations may authorize a presumption, in the absence of evidence, that a collision may have resulted from other causes; that it was attributable to said noncompliance and the absence of the statutory precautions. If there is evidence tending to prove that a collision, and consequent injury, were caused solely by other means, or the negligence or wrongful acts of others, it becomes a question of fact, and the circumstance that the injured vessels were not manned, or did not carry the lights or take the course prescribed by law for vessels in the same situation, is to be considered as one of the circumstances to be taken into consideration in determining the liability of the

parties, but not as of itself necessarily in all cases controlling or decisive." Blanchard v. Steamboat Co., 59 N. Y. 292, 296. The Farragut, 10 Wall. 334. In cases of collision, "it is to be presumed against a vessel which, at the time of the collision, is in violation of a statutory rule intended to prevent collisions, that her fault was at least a contributory cause of the disaster, and that the burden rests upon her of showing, not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." Judge Wallace, in The Bolivia, 1 C. C. A. 221, 49 Fed. 169. The Pennsylvania, 19 Wall. 125; Belden v. Chase, 150 U. S. 674, 14 Sup. Ct. 264; Richelieu & O. Nav. Co. v. Boston Marine Ins. Co., 136 U. S. 408, 422, 10 Sup. Ct. 934. That the engineer had no license certainly did not contribute to cause the injury. It seems to me clear, also, that the violation of the statutory rule as to a pilot could not have contributed to cause said injury, for the following reasons: The libelant was an experienced navigator, and had been through this bridge on several occasions under similar circumstances. He had examined the channel at and about the bridge, at low water, in a skiff. Clearly, upon a showing of these facts, he would have been entitled to receive a license as pilot. But such license to him, or the presence of any licensed pilot, could not have prevented the disaster, provided she stranded, as the proponderance of evidence proves, by reason of her wheel striking the mud in the center of the channel. Nor would a licensed pilot have been justified in attempting, or required to attempt, to turn around or back out, and lie in the river or on the flats below, if it was either unsafe to lie on said flats or impossible to turn around or back out, when it was too late to pass through by reason of the falling tide. If there was any error, which does not seem to be the case, it was an error of judgment. But, even if there had been such an error under such circumstances, it would not have been negligence. The Thingvalla, supra; The Chatham, supra; The E. A. Packer, 49 Fed. 92; The Havana, 54 Fed. 201, and cases cited; The Havilah, 1 C. C. A. 519, 50 Fed. 331. In The Pennsylvania and The Bolivia, supra, it appeared that the violation of the statute was a fault, and that it probably contributed to cause the collision, and therefore the rule above stated was applied. But in Bentley v. Coyne, 4 Wall. 511, The Farragut, 10 Wall. 334, and The Chatham, 3 C. C. A. 164, 52 Fed. 396, it is held that where a peril is impending, or where the danger, caused by a party in fault, is such as to induce a mariner of ordinary skill and competent knowledge to conceive it to be inevitable, the violation of a statutory rule is an error, and not a fault. The language of Mr. Justice Bradley, in The Farragut, 10 Wall. 338, seems to be peculiarly appropriate to this case. He says, citing the act of congress for the protection of navigation:

"But it would be against all reason to contend that the master or owners of a vessel should be made liable for the consequences of an accident by reason of not having a special lookout, where the collision or loss could not have been guarded against by a lookout, or where it is clear that the absence of a lookout had nothing to do in causing it. * * * We are not to shut our eyes and to accept blindly an artificial rule which is to determine, in all cases, whether the navigator is liable to the charge of negli-

gence in causing any loss or damage that may happen. A lookout is only one of the many precautions which a prudent navigator ought to provide, but it is not indispensable where, from the circumstances of the case, a lookout could not possibly be of any service. * * * It is perfectly evident that the absence of a special lookout had nothing at all to do with the happening of the accident, and therefore it can have nothing to do with fixing the liability of the parties."

The question now presented is whether the town of Westport, being under a statutory obligation to maintain this highway and bridge over a navigable stream, but under no obligation to operate said drawbridge, having voluntarily operated it for 10 years, and, on the day of this accident, the bridge tender being absent, having undertaken, through its first selectman and others, to operate said draw, and having been negligent therein, is liable to this libelant for damages suffered by reason of such negligence. One branch of the question involved was raised and discussed upon exceptions to the jurisdiction, and was decided adversely to the defendant. 53 Fed. 824. But the forcible and ingenious argument of counsel, after hearing on the merits, has seemed to call for a consideration of the whole question in the light of the facts developed at the trial. The argument of the senior counsel for defendant asserts, and proceeds upon the assumption, that the breach of duty complained of consists in an omission or neglect to perform the public duty of opening a draw, and that this duty could only result from the duty imposed by the General Statutes of Connecticut upon the town of Westport to maintain in proper condition the highways and bridges of the state within that town, and that the defendant town cannot thus be held liable for such negligence in the absence of a statutory provision to that effect. The libel merely alleged that said drawbridge was part of a public highway crossing public navigable waters of the United States, and as such was in the care, control, and management of the defendant. The breach of the duty complained of was the negligent failure of the town to open said draw, or negligence in its control and operation. It was not claimed that there was any public duty or obligation to operate said draw arising from any general statute or other legislative act. On the contrary, the counsel for defendant who tried the cause proved upon the trial, and claimed in his argument and brief, that the defendant town in 1857 voluntarily assumed the obligations of a charter granted in 1796 to a turnpike company, that neither said company nor said town was ever under any obligation, by legislative act or otherwise, to operate said draw, and that, down to 1880, said draw had always been operated by the persons passing through it in vessels, but that in 1880 the town voluntarily employed a draw tender to operate it. There is no statute requiring towns to open or close drawbridges, or to provide draw tenders therefor, and it is admitted that, where a draw tender is required, such requirement is uniformly provided for by charter. Inasmuch, therefore, as there is an express statutory obligation resting upon towns to maintain highways for public travel, and none in reference to the operation of drawbridges, the legal position of the town in reference to the two matters is necessarily radically different. It is well settled that the liability of a municipal

corporation created by charter is greater than that of involuntary quasi corporations, such as towns. Dill. Mun. Corp. § 961. It is settled in Massachusetts that, where public or governmental duties are imposed by statute upon a town or other quasi corporation solely for the benefit of the public, such corporation is not liable to a private action for neglect in the performance of such corporate duty, unless such action is given by statute. Hill v. Boston, 122 Mass. 344. And it has been held in Connecticut that a municipal corporation is not liable for the negligent performance of a strictly governmental duty. Hewison v. New Haven, 37 Conn. 475; Jewett v. New Haven, 38 Conn. 368. That such exemption from liability is not in harmony with the general rule of liability in this country, nor with the decisions of the federal courts, is settled by the repeated adjudications of the supreme court of the United States. Barnes v. District of Columbia, 91 U. S. 540, citing Jones v. New Haven, 34 Conn. 1; Evanston v. Gunn, 99 U. S. 660; Chicago v. Robbins, 2 Black, 428; Nebraska City v. Campbell, Id. 590; Weightman v. Corporation of Washington, 1 Black, 50; City of Detroit v. Osborne, 135 U. S., at page 498, 10 Sup. Ct. 1012. See, also, Patton v. Montgomery, 96 Ind. 131; City of Goshen v. Myers, 119 Ind. 196, 21 N. E. 657. But for the present consideration of this question it will be assumed that the federal courts are bound herein to follow the decisions of the highest court of this state.

In view of the further claim of the defendant that, if no statutory obligation was imposed upon the defendant to operate said draw, it cannot be liable for negligence, because it was without legal power to maintain or manage it, it becomes important to consider the powers of the town, the character of the acts undertaken by it, and the rules of law applicable thereto. It will not be denied that the duty of operating the draw is one which might have been imposed upon the town by the legislature, just as the duty of building drawbridges across navigable streams has been imposed by the act of 1880. Escanaba, etc., Co. v. City of Chicago, 107 U. S. 678, 2 Sup. Ct. 185; Miller v. Mayor, 109 U. S. 385, 3 Sup. Ct. 228; Weisenberg v. Town of Winneconne, 56 Wis. 667, 14 N. W. 871. A town has the power to acquire and hold all such property as may be reasonably necessary for those purposes of municipal government for which it exists. Dill. Mun. Corp. § 562, p. 657; White v. Stamford, 37 Conn. 578. And "towns may make such regulations for their welfare, not concerning matters of a criminal nature, nor repugnant to the laws of the state, as they may deem expedient." Gen. St. 1888, p. 31. Under such authority, the town of Westport acquired said bridge and draw, and at its town meetings, and through its selectmen, provided for the appointment of a draw tender and the management of said draw. Towns are required to build and maintain all necessary highways and bridges within their limits. The town, having assumed the construction and maintenance of a bridge at this point, will not now be allowed to claim that it is not required to maintain it. Village of Marseilles v. Howland, 124 Ill. 547, 16 N. E. 883; Requa v. City of Rochester, 45 N. Y. 129. As already seen, under the statute of 1873 it was further enacted

that no bridge without a draw should be built or maintained across any water navigated by open or deck vessels. Under these circumstances, I do not see how it can be claimed that the town had no power to determine whether it would permit its draw to be managed and operated by its own agent, or would leave it to be operated, as formerly, by any irresponsible person who might have occasion to pass through it. If it has thus undertaken to manage its property, it should not now be allowed to claim that such undertaking was unauthorized or ultra vires. Williams v. Cummington, 18 Pick. 312; Mayor v. Sheffield, 4 Wall. 189. All the cases cited by defendant, upon the claim of ultra vires, to show that the town cannot be held liable for the negligence of its agents, are where acts were done, or contracts made, which were necessarily wholly outside of the corporate powers of the town,—such as, appropriating money from the treasury of the town to pay bounties to inhabitants of the town drafted for the war, or to such substitutes as they might furnish, or for a Fourth of July celebration; or the expending of money by a committee for a certain purpose beyond the amount specifically appropriated for such purposes in the town meeting. The question of liability in such cases is governed by an entirely different principle from that applied in actions ex delicto. Dill. Mun. Corp. § 971; Salt Lake City v. Hollister, 118 U. S. 256, 6 Sup. Ct. 1055. If the wrongful act be not wholly ultra vires, then the corporation is liable for such negligence. Dill. Mun. Corp. § 968, and cases. The general rule is well settled that a municipal corporation is liable for the negligence of its agents or officers in reference to matters within the general powers of the corporation, though not specifically conferred. Id. §§ 971, 979, 980. In Weisenberg v. Town of Winneconne, supra, the supreme court of Wisconsin says, in reference to the management of a drawbridge by the defendant town: "The town had the right to assume such power, right, and duty; and, this being so, the town is liable for neglect of such special duty, as any corporation or individual would be under the same circumstances." And in the carefully considered case of Houfe v. Town of Fulton, 34 Wis. 608, where a town sought to escape liability for injuries caused by the insufficiency of a bridge over a navigable stream, on the ground that it was not a lawful structure, Chief Justice Dixon held that the maintenance of such bridge was within the scope of the corporate powers of said town, and that said bridge having been adopted by said town, it was estopped to set up such defense. See, also, Mayor v. Sheffield, supra. If these conclusions be correct, there can be no question that the town is liable for negligence in the exercise of this power in the same way, and to the same extent, as a private corporation exercising such powers. "Municipal immunity does not reach beyond governmental duty." Judge Pardee, in Weed v. Borough of Greenwich, 45 Conn., at page 183. It is settled that a private corporation would be liable under such circumstances. Pennsylvania R. Co. v. Central R. Co. of New Jersey, supra; Blanchard v. Telegraph Co., 60 N. Y. 510; In re Pratt, 24 Fed. 335, 25 Fed. 799; The City of Richmond, 43 Fed. 85. In voluntarily assuming such undertaking, the town is held to im-

pliedly contract for the exercise of due care, and that it will respond in damages resulting from negligence therein. City of Galveston v. Posnainsky, 62 Tex. 118. The town, having voluntarily undertaken to operate said draw, could not wait until the vessel came up to the bridge, and then, having led the libelant to believe that it would open the draw, and having failed so to do, escape liability on the ground that it was under no legal obligation to operate it. It was at least bound to give seasonable notice that it disclaimed such obligation. Jones, Neg. Mun. Corp. § 119, and cases cited; Edgerton v. Mayor, 27 Fed. 233, and cases cited; Thorp v. Brookfield, 36 Conn., at page 323; Sewell v. Cohoes, 75 N. Y., at page 52, and cases; Village of Marseilles v. Howland, 124 Ill. 547, 16 N. E. 883. Public governmental duties are such as pertain to the administration of general laws for the benefit and protection of the whole public, the discharge of which is delegated or imposed by the state upon the municipal corporation. Hart v. Bridgeport, 13 Blatchf. 293, Fed. Cas. No. 6,149; City of Galveston v. Posnainsky, 62 Tex. 118. "If such duty is granted or imposed upon the municipality as a public instrumentality of the state, for public purposes exclusively, it belongs to the corporate body in its public, political, or municipal character." Bailey v. Mayor, 3 Hill, 539; Hill v. Boston, supra. "There is no mode by which to determine whether a power or duty is governmental or not except to inquire whether it is in its nature such as all well-ordered governments exercise generally for the good of all, and one whose exercise all citizens have a right to require directly or by municipal agency, and whether it has ever been assumed or imposed, as such, by the government of this state, and would have been exercised by the state if it had not been by the city. Tested by these criteria, the extinguishment of fires is not a public governmental duty." Chief Justice Butler, in Jewett v. New Haven, 38 Conn. 389.

Tested by these criteria, it does not seem that the voluntary action of this town in opening and closing this draw, in the absence of general or special legislation for the protection of the bridge itself, or for the convenience of navigators and the benefit of the wharves above the bridge, or to provide for the convenience and safety of those persons having occasion to travel across the bridge, and to avoid unnecessary obstructions to the highway, can be considered, in any sense, a public governmental act. Maxmilian v. Mayor, 62 N. Y. 160. Furthermore, even if the town, acting under the authority of the state, might have obstructed navigation at this bridge, congress might at any time interfere to remove such obstruction. Bridge Co. v. Hatch, 125 U. S. 1, 8 Sup. Ct. 811; South Carolina v. Georgia, 98 U. S. 4. And it may fairly be assumed that the town has undertaken thus to operate said draw for its own welfare and in order to avoid the effects of such interference by congress, and has, therefore, impliedly contracted with those having occasion to pass through said draw that it will seasonably operate the same, provided no such congressional legislation is sought. Edgerton v. Mayor, supra. "Private or corporate powers are those which the city is authorized to execute for its own emolument, and from which

it derives special advantage, or for the increased comfort of its citizens, or for the well ordering and convenient regulation of particular classes of the business of its inhabitants, but are not exercised in the discharge of those general and recognized duties which are undertaken by the government for the universal benefit." Judge Shipman, in Hart v. Bridgeport, 13 Blatchf., at page 293, Fed. Cas. No. 6,149. Where an element partly commercial comes in, a liability is usually enforced, the ultimate question being whether the legislature intended that the town should be liable. Mt. Hope Cemetery v. City of Boston, 158 Mass. 513, 33 N. E. 695. The distinction between the public capacity of towns, in the discharge of duties imposed on them by the legislature for the public benefit, and their private character, in the management of property and rights voluntarily held by them, is not unworthy of remark in determining this question of liability. In this case, the town voluntarily assumed the rights and obligations of a private chartered corporation, and has ever since exercised them without other authority than that derived from the town meeting and the acquiescence of its inhabitants. See Mt. Hope Cemetery v. City of Boston, 158 Mass., at page 512, 33 N. E. 695; Dill. Mun. Corp. §§ 66, 68, 971, 985; Oliver v. Worcester, 102 Mass. 489; Jones v. New Haven, 34 Conn. 1; Hill v. Boston, supra; Haskell v. New Bedford, 108 Mass. 208. It is further to be borne in mind that the rule that a private action cannot be maintained against a quasi corporation for neglect of public duty unless the action be given by statute is of limited application. "It is applied, in the case of towns, only to the neglect or omission of a town to perform those duties which are imposed upon all towns without their corporate assent, and exclusively for public purposes, and not to the neglect of those obligations which a town incurs when a special duty is imposed on it with its consent, express or implied, or a special authority is conferred on it at its request. In the latter case, a town is subject to the same liabilities for the neglect of those special duties to which private corporations would be if the same duties were imposed or the same authority conferred on them, including their liability for the wrongful neglect, as well as the wrongful acts, of their officers and agents." Mr. Justice Metcalf, in Bigelow v. Randolph, 14 Gray, 541. Judge Carpenter, in Jones v. New Haven, 34 Conn., at page 13, says: "This rule of law is of very limited application. It is applied, in the case of towns, only in the neglect or omission of a town to perform those duties which are imposed on all towns without their corporate assent, and exclusively for public purposes." It is well settled that for acts causing injury in performing work which is within the general powers of a town, though not specifically conferred, or for negligence in the performance of a corporate duty in which the party injured has an interest, or for the improper management and use of its property, a town is liable in the same manner as private corporations and natural persons. Dill. Mun. Corp. §§ 971, 980, 985. As is said in the leading case cited by counsel for defendant, in Massachusetts, where the doctrine of exemption of towns from liability has been carried further than in any other state, "If a city or town negligently constructs

or maintains the bridges or culverts in a highway across a navigable river or natural watercourse so as to cause the water to flow back upon and injure the land of another, it is liable to an action of tort to the same extent that any corporation or individual would be liable for doing similar acts," because "in such cases the cause of action is not neglect in the performance of a corporate duty rendering a public work unfit for the purposes for which it is intended, but it is the doing of a wrongful act causing a direct injury to the property of another outside of the limits of the public work." Chief Justice Gray, in Hill v. Boston, supra. The court further says, at page 365: "In Brownlow v. Board, 13 C. B. (N. S.) 768, 16 C. B. (N. S.) 546, a public board, authorized to construct sewers, but which, in excess of its authority, had made an obstruction which was a public nuisance in the bed of a navigable river, was held liable to one whose vessel suffered injury thereby. These cases fall within the same principle as Haskell v. New Bedford, 108 Mass. 208, and other decisions of this court, already cited, in which, by a wrongful act, a direct injury was done to the plaintiff's property beyond the lawful limits of the public work."

An examination of these cases will show that they conclusively establish liability in a case like the present.

From these considerations, I am led to conclude that the defendant town, having acquired the property of the private corporation, and, in addition to the duties exercised by it, having without any statutory or other obligation, voluntarily assumed and undertaken, under its general powers, since 1880, to open and close the draw for purposes which, under the circumstances, may be assumed to have been, or which do not appear not to have been, for its own benefit or the benefit of its property, and having recognized the right of commerce, to have said draw so operated, and having either impliedly contracted with the public to operate it, or having, at least, invited the public to believe that it had recognized such right, cannot withdraw from said undertaking without seasonable notice; and that it is under the same obligations in reference to the performance of said undertaking, and is liable to the same extent for negligence therein, as a private person or corporation engaged in a similar undertaking for a purely private purpose. Here the damage was the direct result of the negligence of the town in the ministerial execution of an undertaking which it had assumed and attempted to perform. It seems to me, further, that these conclusions are supported by the cases cited in Connecticut and Massachusetts. Thus, in Mootry v. Danbury, 45 Conn. 550, the town, being bound to maintain a bridge across a stream of water on a highway, so constructed it that there was not sufficient space to allow the water to pass off freely, and thereby caused it to set back on the land of the plaintiffs. The court, in its opinion, having cited from and approved the dissenting opinion of Chief Justice Butler, in Judge v. Meriden, 38 Conn. 90, said:

"It seems that that learned jurist had no doubt that towns were liable for the consequences of an improper construction of a highway. We discover nothing in the opinion of the court which is inconsistent with that view.

The chief justice and the other members of the court differed only in the construction of the record. But the case of Danbury & N. R. Co. v. Town of Norwalk, 37 Conn. 109, is more directly in point. The only difference between that case and this is that that was a petition in chancery to restrain the town from committing the wrong, and this is an action at law to recover damages for the wrong committed. The principle applicable to the two cases is the same. The injunction was granted only because the contemplated action of the town was an invasion of the legal rights of the railroad company. If that was so in that case, it is in this; and, if the defendants have invaded the legal rights of the plaintiffs, they are responsible. The conclusion is inevitable. The reasoning of the court assumes that a town would be liable in a case like this. In speaking of the power and duty of towns in respect to highways, the court says (page 119): 'The authority is clear and the duty imperative; always subject, however, to the salutary qualification, interposed for the protection of others, that this authority shall be so exercised, and this duty discharged in such a manner, as to occasion no wanton injury to the property or rights of other persons, natural or artificial.' This is sound law, and is abundantly sustained by the authorities cited. It seems to us impossible to hold that this town is exempt without overruling that case. We regard the principle there enunciated as sound, and in harmony with decided cases elsewhere."

In Danbury & N. R. Co. v. Town of Norwalk the town had undertaken to construct a drain which was to discharge water into a cut, to the injury of the property of the railroad company. The court there said:

"The question whether such a corporation as the respondent, in consequence of any immunity inherent in its municipal character, is exempt from those liabilities, for malfeasance for which individuals and private corporations would be liable in a civil action by the party injured, is no longer an open one. The acts of the character of those now in question involved in the necessary performance of a duty prescribed by a municipal ordinance are strictly ministerial, and, when performed by an officer or agent by direction and for the benefit of the corporation, no exemption from liability by the principal can be interposed when from negligence or willfulness they are so performed as to produce unnecessary damage to other parties. Perry v. City of Worcester, 6 Gray, 544; Sprague v. City of Worcester, 13 Gray, 193; Rochester White Lead Co. v. City of Rochester, 3 N. Y. 464; Mayor v. Bailey, 2 Denio, 433; Mayor v. Furze, 3 Hill, 612; McCombs v. Town Council, 15 Ohio, 476."

In Carson v. City of Hartford, 48 Conn. 90, in Morse v. Fair Haven East, Id. 222, in Healey v. New Haven, 47 Conn. 305, and in Bronson v. Borough of Wallingford, 54 Conn. 520, 9 Atl. 393, the court cites and approves Mootry v. Danbury, supra. In the latter case, where there was no accusation of negligence, but merely of an intent to change the grade of a highway, the court distinguishes between the facts therein and the case of Mootry v. Danbury, and says:

"It is only in special cases, where wanton or unnecessary damage is done, or where damage results from negligence, that they [towns] can be held responsible."

And in Healey v. New Haven, supra, the court says:

"The town or city, as the case may be, is practically the owner of the land for all the purposes of a highway. So long as it is used strictly for those purposes, with due regard for the rights of others, no liability attaches. If, however, the work is improperly or negligently done, thereby causing damage to others, the corporation, like an individual, is liable. Mootry v. Danbury, 45 Conn. 550.

Further cases upon this subject are collected and discussed in Weed v. Borough of Greenwich, 45 Conn. 170, where the borough was empowered to remove an encroaching fence, for the advantage of the borough, and to improve property therein. The principles therein involved are strikingly like those in the case at bar, and the decision is a direct authority in support of the rule that corporate liability, in such cases, is the same as individual liability. In Massachusetts the same distinction is made, and the rule as above stated is supported by the following, and many other, cases, in addition to those already cited, namely: Perry v. City of Worcester, 6 Gray, 544; Hawks v. Charlemont, 107 Mass. 417; Waldron v. Haverhill, 143 Mass. 582, 10 N. E. 481; Doherty v. Inhabitants of Braintree, 148 Mass. 495, 20 N. E. 106. In the latter case the town voted to take charge of the work, and appointed a committee of five to act with the selectmen, all as agents of the town. It seems to me from these decisions that, even if the operation of this draw was connected with the maintenance of the highway, or for other reasons was the performance of a public governmental duty, the defendant would be liable for negligence upon the facts proved in this case. It will be noticed that most of the Connecticut cases cited have been decided since the cases relied on by the learned counsel for defendant. The well-recognized distinction is nowhere more clearly and accurately stated than in Goddard v. Inhabitants of Harpswell, 84 Me. 499, 24 Atl. 958, decided in 1892, where the court, reviewing the Massachusetts decisions, says:

"The distinction between the two classes of cases is clear. In the one class the municipality has interfered by giving directions, or taking charge of the work by its own agents, as in Woodcock v. Calais, 66 Me. 234. In the other class, the municipality has not interfered, 'but has left the work to be performed by the proper public officers, in the methods provided by the general laws.'"

But the defendant contends that in this case the question of liability must be determined by the law of Connecticut, and that what the law of Connecticut is appears from the cases cited by him, and from the case of French v. Boston, 129 Mass. 592. The libelant contends that this is a question of general common law or commercial law, and that, if there is any conflict between the law of Connecticut and the general law, this court should be governed by the general rules of law, and especially by the decisions of the federal courts. He further contends that, upon this question of damages arising from a maritime tort, it is the duty of a court of admiralty to administer relief according to its own procedure and rules, and to enforce its rules of liability so as to do justice. As already stated, it does not seem that there is any conflict, under the facts in this case, between the decisions of Connecticut and the general rules of law. As has been already shown, it is settled by the repeated adjudications of the supreme court of the United States that the rule of liability established in Massachusetts is not in harmony with the general rule in this country, nor with the decisions of the federal courts. In this connection it seems desirable to examine the decisions of the supreme court of the United States upon the distinction between

local laws, where the federal courts follow the decisions of the courts of the state, and general law, where the federal court is bound to exercise its independent judgment. "What constitutes a contract of carriage is not a question of local law, upon which the decision of a state court must control. It is a matter of general law, upon which this court will exercise its own judgment." Myrick v. Railroad Co., 107 U. S., at page 109, 1 Sup. Ct. 425. "On a question of general common law, the federal courts administering justice in New York have equal and co-ordinate jurisdiction with the courts of that state." Railroad Co. v. Lockwood, 17 Wall. 357. When private rights are to be determined by the application of common-law rules alone, the federal courts are not bound by the decisions of the state courts. Chicago v. Robbins, 2 Black, 428, 4 Wall. 657. Nor are they bound by the decisions of said courts on general questions of commercial law. Hough v. Railroad Co., 100 U. S. 213; Oates v. Bank, 100 U. S., at page 246. This whole subject is exhaustively discussed by the supreme court of the United States in Railroad Co. v. Baugh, 149 U. S. 371, 13 Sup. Ct. 914, reviewing Swift v. Tyson, 16 Pet. 1, and all the leading cases decided since that date in said court. Under said decisions, and especially the decision in Claiborne Co. v. Brooks, 111 U. S. 400, 4 Sup. Ct. 489, it seems clear that a federal court administering the rules of the common law within a state is bound by the local policy of each state as to the extent of the powers and liabilities of its municipal corporations, wherever such powers and liabilities have been determined by legislative authority or the settled decisions of its highest courts, but that, where the law relating to such a question "is unsettled and doubtful, such court must exercise its independent judgment, and declare the law upon the best light it can obtain." "Where the law has not been thus settled it is the right and duty of the federal courts to exercise their own judgment, as they always do in reference to the doctrine of commercial law and general jurisprudence." Burgess v. Seligman, 107 U. S. 20, 2 Sup. Ct. 10. In the present case, there is neither legislative act nor decision of a Connecticut court establishing freedom from liability for negligence, in the absence of legislation, before the court. But in French v. Boston, supra, cited by defendant, the city of Boston was held not liable for damages caused by the detention of a vessel owing to the fact that the draw was of insufficient width for the vessel to pass through. And, while the case may be distinguished from the one at bar in the fact that, while the obligation was imposed by statute, no liability was imposed for negligence, and the municipality "had left the work to be performed by the proper public officer," and for other reasons, yet it is an authority in support of the claim of defendant. But, even if it were a direct decision in its favor, it would not show that the courts of Connecticut would follow such decision. For this reason, and because of the conclusion reached after the very careful examination of the decisions of this state as to the law herein, it seems to me that, at most, the defendant is only entitled to claim that the question herein presented is still an open one so far as the courts of Connecticut or the acts of its legislature are concerned.

It remains to consider whether the principles thus far stated are applicable in a court of admiralty. How far the maritime law, administered by this court of admiralty, may be enforced for the removal of obstructions in navigable rivers, is still an open question. Bridge Co. v. Hatch, 125 U. S. 1, 8 Sup. Ct. 811. But there is no question, upon authority or principle, as to the power of a court of admiralty to administer relief under the facts in this case. In Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S., at page 443, 9 Sup. Ct. 469, Mr. Justice Gray, delivering the opinion of the court, says:

"The decisions of the state courts certainly cannot be allowed any greater weight in the federal courts when exercising the admiralty and maritime jurisdiction exclusively vested in them by the constitution of the United States."

The admiralty and maritime jurisdiction is conferred on the courts of the United States, and state laws cannot enlarge or restrict said jurisdiction, but the admiralty courts have jurisdiction to enforce admiralty rights according to their own procedure. Upon such questions the decisions of the highest court of the state do not relieve the admiralty court from the duty of exercising its own judgment. The J. E. Rumbell, 148 U. S. 1, 13 Sup. Ct. 498; The Lottawanna, 21 Wall., at page 580; The Guiding Star, 18 Fed. 263. In Steamboat Co. v. Chase, 16 Wall., at page 531, where an action had been brought under a state statute in the state court, by an administrator for damages for injuries by a collision, resulting in death, Justice Clifford said:

"If the injured party had survived no doubt is entertained that he might have sought redress for his injuries in the proper admiralty court, wholly irrespective of the state statute enacting the remedy there given, and prescribing the form of action and the measure of damages, as the wrongful act was committed on navigable waters within the admiralty and maritime jurisdiction conferred upon such courts by the constitution and the laws of congress."

The general rule of the federal courts on this question is enforced in admiralty. The Titan, 23 Fed. 413; Holt, Con. Jur. 208. The various decisions of the federal courts hereinbefore cited, and the reasons leading to the conclusions therein, seem to show that, where a question of maritime right is presented to an admiralty court, that court, at least in the absence of legislation establishing a contrary rule, may enforce said right, and provide remedies for its violation in accordance with the rules of admiralty. In City of Boston v. Crowley, 38 Fed. 202, Judge Colt, affirming the decree of the district court in admiralty, in a case almost precisely like the one at bar, held the city of Boston liable, and examined therein the cases bearing upon the questions raised in this case. He held that the question involved was one "of general municipal or commercial law, and, as such, this court should follow the decisions of the supreme court of the United States." In Edgerton v. Mayor, 27 Fed. 230, Judge Brown, upon a careful consideration of the same question, held the city of New York liable for negligence in operating a draw in a bridge across the Harlem river. He held, citing several cases, that, by undertaking to manage the draw, the state and city had recognized the right of

vessels to pass through without any appeal to the national authorities to protect that right, and that the city was therefore responsible for negligence therein. And in Hill v. Board, 45 Fed. 260, Judge Green, sustaining the jurisdiction of admiralty over a claim for damages for negligence in the management of a drawbridge, declares that the action therefor is based upon a maritime tort, of which courts of admiralty have plenary jurisdiction. The same general rule of obligation and liability is laid down, in Weisenberg v. Town of Winneconne, supra, by the supreme court of Wisconsin. Where municipal corporations control drawbridges, they must furnish a reasonably safe passageway for vessels, and are responsible for damages coming from a neglect of this duty. Jones, Neg. Mun. Corp. § 123. The duty of maintaining a drawbridge over navigable waters includes the obligation to properly provide for the safe passage of vessels through the draw. 2 Am. & Eng. Enc. Law, 549. In the case of Wiggins v. Boddington, 3 Car. & P. 544, cited by the circuit court of appeals, in Pennsylvania R. Co. v. Central R. Co. of New Jersey, supra, the bridge was erected in pursuance of the acts of parliament, and the corporation was established for the express purpose of improving the port of London, but the rule of liability for negligence was the same as that applied by the circuit court of appeals in the above case, and which, it seems to me, should be applied herein.

It is finally to be borne in mind that, in actions for torts arising from negligence, courts of admiralty have not circumscribed themselves within the positive boundaries of mere municipal law, but have proceeded, in regard to questions of damages, upon enlarged principles of equity and justice. Thus, in cases of mutual fault the damages may be divided. And this amelioration of the common-law rule is no longer limited to cases of collision, but is applicable to all cases of marine torts founded upon negligence and prosecuted in admiralty. The Max Morris, 137 U. S. 1, 11 Sup. Ct. 29. When a party elects to bring his suit in the admiralty court, he is bound by the rules and course of proceedings, and is entitled to the remedies, applied in that forum, including its rules for estimating damages. Atlee v. Packet Co., 21 Wall. 389; The Max Morris, supra. If a court of admiralty can thus enforce its rules of damages so as to authorize a recovery when justice requires it, although no such right of recovery exists at common law, I see no reason why it should not enforce its rule of liability in accordance with enlarged principles of justice in a case like the present.

In view of the foregoing considerations, it seems to me that the town is liable. The libel may be amended in conformity with the facts herein found. Let the case be referred to a commissioner to find the damages and report, in accordance with the ordinary rules in such cases.